```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
NATIONAL CREDIT UNION ADMINISTRATION      :
BOARD, as Liquidating Agent of            :
Southwest Corporate Federal Credit        :   13 Civ. 6705 (DLC)
Union and Members United Corporate        :
Federal Credit Union,                     :   OPINION & ORDER
                                          :
                          Plaintiff,      :
                                          :
-v-                                       :
                                          :
MORGAN STANLEY & CO., INC. and MORGAN     :
STANLEY CAPITAL I INC.,                   :
                                          :
                          Defendants.     :
                                          :
------------------------------------------X
```

APPEARANCES:

For the Plaintiff:

David Fredrick, Wan J. Kim, Gregory G. Rapawy, and Andrew C. Shen
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
Sumner Square, 1615 M Street, N.W., Suite 400
Washington, DC 20036

Erik Haas, Peter W. Tomlinson, Phillip R. Forlenza, and Michelle W. Cohen
Paterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

George A. Zelcs
Korein Tillery LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601

Stephen M. Tillery, Greg G. Gutzler, Peter H. Rachman, and Robert L. King
Korein Tillery LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101

For the Defendants:

James P. Rouhandeh, Paul S. Mishkin, Daniel J. Schwartz, and
Jane M. Morril
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017


DENISE COTE, District Judge:

    This is one of nine actions brought by the National Credit

Union Administration Board ("NCUA" or "the Board"), as

liquidating agent of Southwest Corporate Federal Credit Union

("Southwest") and Members United Corporate Federal Credit Union

("Members United") (collectively, the "Credit Unions"), against

various financial institutions involved in the packaging,

marketing, and sale of residential mortgage-backed securities

that the Credit Unions purchased in the period from 2005 to

2007.[1]  NCUA filed this case against Morgan Stanley & Co., Inc.

and Morgan Stanley Capital I Inc. (collectively "Morgan

Stanley") on September 23, 2013.  The complaint asserts claims

---

[1] Nat'l Credit Union Admin. Bd. ("NCUA") v. Morgan Stanley & Co.,
Inc., et al., 13 Civ. 6705 (DLC); NCUA v. Bear Stearns & Co., et
al., 13 Civ. 6707 (DLC); NCUA v. Wachovia Capital Markets, LLC
n/k/a Wells Fargo Secs., LLC, 13 Civ. 6719 (DLC); NCUA v.
Goldman Sachs & Co., et al., 13 Civ. 6721 (DLC); NCUA v. RBS
Secs., Inc., et al., 13 Civ. 6726 (DLC); NCUA v. Barclays
Capital, Inc., 13 Civ. 6727 (DLC); NCUA v. Residential Funding
Secs., LLC n/k/a Ally Secs., LLC, 13 Civ. 6730 (DLC); NCUA v.
UBS Secs., LLC, 13 Civ. 6731 (DLC); and NCUA v. Credit Suisse
Secs. (USA) LLC, et al., 13 Civ. 6736 (DLC).

under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15
U.S.C. §§ 77k, *l*(a)(2) (2012) ("Securities Act"); the Illinois
Securities Law of 1953, 815 <u>Ill. Comp. Stat. Ann.</u> 5/12 & 13
(2013) ("Illinois Blue Sky Law"); and the Texas Securities Act,
<u>Tex. Rev. Civ. Stat. Ann.</u> art. 581, § 33 (2013) ("Texas Blue Sky
Law").  On November 13, Morgan Stanley filed a motion to dismiss
the complaint.  For the reasons that follow, the motion is
granted in part.

BACKGROUND

     The complaint includes the following allegations.  The
Credit Unions purchased over $400 million in residential
mortgage-backed securities ("RMBS") issued, underwritten, or
sold by Morgan Stanley entities during the period between
December 2005 and June 2007.  At the time they were issued, all
but three of these securities were rated triple-A.

     RMBS are securities entitling the holder to income payments
from pools of residential mortgage loans that are held by a
trust.  For each of the securities at issue here, the offering
process began with a "sponsor," which acquired the mortgage
loans that were to be included in the offering.  The sponsor
transferred a portfolio of loans to a trust that was created
specifically for that securitization; this task was accomplished

3

through the involvement of an intermediary known as a
"depositor."  The trust then issued Certificates to an
underwriter, in this case Morgan Stanley, which in turn, sold
them to the Credit Unions.  The Certificates were backed by the
underlying mortgages.  Thus, their value depended on the ability
of mortgagors to repay the loan principal and interest and the
adequacy of the collateral in the event of default.

Each of the Certificates implicated in this case was issued
pursuant to registration statements, prospectuses, prospectus
supplements, term sheets, free writing prospectuses, and other
written materials (referred to in this Opinion as "offering
documents" or "offering materials").  These offering documents
were prepared by Morgan Stanley.

Generally, NCUA asserts that the offering documents for the
twenty-eight securities identified in the complaint contained
materially "untrue statements and omissions."[2]  More

---

[2] The twenty-eight securities at issue are: Morgan Stanley ABS
Capital I Inc. Trust 2006-HE4, CUSIP 61748BAC8 ("MSABSCI 2006-
HE4-C8"); Morgan Stanley ABS Capital I Inc. Trust 2006-HE4,
CUSIP 61748BAE4 ("MSABSCI 2006-HE4-E4"); Morgan Stanley ABS
Capital I Inc. Trust 2006-HE6 ("MSABSCI 2006-HE6"); Morgan
Stanley ABS Capital I Inc. Trust 2006-HE8 ("MSABSCI 2006-HE8");
Morgan Stanley ABS Capital I Inc. Trust 2006-NC4 ("MSABSCI 2006-
NC4"); Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2
("MSABSCI 2006-WMC2"); Morgan Stanley ABS Capital I Inc. Trust
2007-HE4 ("MSABSCI 2007-HE4"); Morgan Stanley ABS Capital I Inc.
Trust 2007-HE5 ("MSABSCI 2007-HE5"); Morgan Stanley Capital I
Inc. Trust 2006-HE2, CUSIP 617451EU9 ("MSCI 2006-HE2-U9");
Morgan Stanley Capital I Inc. Trust 2006-HE2, CUSIP 617451EW5

particularly, the complaint alleges that statements in the

offering documents concerning the following subjects were untrue

when made:

> (1) That the loans adhered to the applicable
> underwriting guidelines (including reduced
> documentation programs), and that exceptions to those
> guidelines would only be granted when warranted by
> compensating factors; and
> (2) that appraisals were accurate, that loans had
> certain "loan-to-value" ratios individually and in the
> aggregate, that a certain percentage of the properties
> were owner-occupied, and that the borrowers had
> certain debt-to-income (DTI) ratios.

NCUA asserts that these misrepresentations were material, and

that because the market value of the RMBS purchased by the

Credit Unions has declined, the "Credit Unions have suffered

---

("MSCI 2006-HE2-W5"); Morgan Stanley Home Equity Loan Trust
2006-1 ("MSHEL 2006-1"); Morgan Stanley Home Equity Loan Trust
2007-2 ("MSHEL 2007-2"); Morgan Stanley IXIS Real Estate Capital
Trust 2006-1 ("MSIXISREC 2006-1"); Morgan Stanley Mortgage Loan
Trust 2005-11AR ("MSML 2005-11AR"); Morgan Stanley Mortgage Loan
Trust 2005-3AR ("MSML 2005-3AR"); Morgan Stanley Mortgage Loan
Trust 2006-8AR ("MSML 2006-8AR"); Morgan Stanley Mortgage Loan
Trust 2006-9AR ("MSML 2006-9AR"); Morgan Stanley Mortgage Loan
Trust 2006-10SL ("MSML 2006-10SL"); Morgan Stanley Mortgage Loan
Trust 2006-13ARX ("MSML 2006-13ARX"); Morgan Stanley Mortgage
Loan Trust 2006-16AX ("MSML 2006-16AX"); Morgan Stanley Mortgage
Loan Trust 2007-2AX ("MSML 2007-2AX"); Morgan Stanley Mortgage
Loan Trust 2007-4SL ("MSML 2007-4SL"); Morgan Stanley Mortgage
Loan Trust 2007-5AX ("MSML 2007-5AX"); Morgan Stanley Mortgage
Loan Trust 2007-11AR ("MSML 2007-11AR"); Natixis Real Estate
Capital Trust 2007-HE2 ("NREC 2007-HE2"); RALI Series 2006-QA5
Trust ("RALI 2006-QA5"); and Saxon Asset Securities Trust 2007-2
("SAS 2007-2").
   Only twenty-seven securities are listed here because
Certificates sold by MSML 2006-16AX Trust were purchased by both
Southwest and Members United, and NCUA brings claims based on
each purchase independently.

significant losses from those RMBS purchased despite the NCUA
Board's mitigation efforts."

On September 24, 2010, the NCUA, an independent executive
agency that oversees and regulates corporate credit unions,
placed the Credit Unions into conservatorship, pursuant to the
Federal Credit Union Act, 12 U.S.C. § 1751.  On October 31, it
placed the Credit Unions into involuntary liquidation.  As
conservator and liquidator of the Credit Unions, NCUA assumed
all rights and privileges of the Credit Unions, including the
ability to bring suit for pending claims.  Just under three
years from the date of the conservatorship, on September 23,
2013, NCUA filed these actions in the Southern District of New
York.

These actions were marked as "related" to a series of
actions before this Court filed by the Federal Housing Finance
Agency ("FHFA"), as conservator of the Federal National Mortgage
Association ("Fannie Mae") and the Federal Home Loan Mortgage
Corporation ("Freddie Mac") (collectively, the "Government
Sponsored Enterprises" or "GSEs"), against various financial
institutions involved in the packaging, marketing, and sale of
RMBS that the GSEs purchased in the period from 2005 to 2007.[3]

---

[3] See Fed. Hous. Fin. Agency ("FHFA") v. UBS Americas, Inc., et
al., 11 Civ. 5201 (DLC); FHFA v. JPMorgan Chase & Co., et al.,
11 Civ. 6188 (DLC); FHFA v. HSBC N. Am. Holdings, Inc., et al.,

The Assignment Committee of the Southern District of New York decided that the NCUA cases should be assigned to this Court. As will be evident throughout this Opinion, this Court's prior analysis in the FHFA cases has direct bearing on many of the issues raised in the present motion.

On October 11, most of the defendants in these NCUA cases moved, before the Multi-District Litigation Panel ("MDL Panel"), to transfer these actions to the District of Kansas, where NCUA has filed securities claims on behalf of these and other corporate credit unions. The MDL Panel will hear argument on the motion on January 31, 2014. Pending the MDL Panel's decision, this Court has continued to supervise these cases, of which seven remain active.[4]

---

11 Civ. 6189 (DLC); FHFA v. Barclays Bank PLC, et al., 11 Civ 6190 (DLC); FHFA v. Deutsche Bank AG, et al., 11 Civ. 6192 (DLC); FHFA v. First Horizon Nat'l Corp., et al., 11 Civ 6193 (DLC); FHFA v. Bank of Am. Corp., et al., 11 Civ. 6195 (DLC); FHFA v. Citigroup Inc., et al., 11 Civ. 6196 (DLC); FHFA v. Goldman, Sachs & Co., et al., 11 Civ. 6198 (DLC); FHFA v. Credit Suisse Holdings (USA), Inc., et al., 11 Civ. 6200 (DLC); FHFA v. Nomura Holding Am., Inc., et al., 11 Civ. 6201 (DLC); FHFA v. Merrill Lynch & Co., Inc., et al., 11 Civ. 6202 (DLC); FHFA v. SG Americas, Inc., et al., 11 Civ. 6203 (DLC); FHFA v. Morgan Stanley, et al., 11 Civ. 6739 (DLC); FHFA v. Ally Fin. Inc., et al., 11 Civ. 7010 (DLC).

[4] Two cases have been dismissed. NCUA v. Bear Stearns & Co., et al., 13 Civ. 6707; NCUA v. Residential Funding Secs., LLC, n/k/a Ally Secs. LLC, 13 Civ. 6730.

On October 9, NCUA wrote to request that this Court adopt a process in this litigation that it had utilized in the related FHFA litigation, wherein the case with the lowest docket number is designated the lead case, the remaining cases are stayed, and the motion to dismiss in the lead action is promptly adjudicated.  Because the first filed action here was brought against Morgan Stanley, it would be designated as the lead case. After all defendants were given an opportunity to be heard on this proposal, and no other defendant opposed the designation of the Morgan Stanley case as the lead case,[5] an Order of October 23 designated the Morgan Stanley case as the lead case and scheduled briefing on its motion to dismiss.

On November 13, Morgan Stanley moved to dismiss the complaint.[6]  The motion was fully submitted on December 16.

---

[5] The defendants sought a stay of all litigation pending a decision by the MDL Panel.

[6] On November 14, at the initial pretrial conference, discovery was generally stayed pending resolution of the motion to dismiss; limited discovery was permitted, however, with respect to the reasonably available loan tapes, so that the parties would be well positioned to engage in efficient discovery following resolution of the motion, in the event the claims survived.  It was communicated to the parties that, if claims in this lead case survived the motion to dismiss, full discovery in all actions would proceed.  Following the conference, the parties also negotiated a protective order, which was signed on December 5, 2013.

DISCUSSION

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.  When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

Motions to dismiss based on a statute of limitations defense may be properly brought under Rule 12(b)(6). McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004); Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989).  Although "[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove, . . . a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the

9

defense appears on the face of the complaint." <u>Staehr v.
Hartford Fin. Servs. Grp., Inc.</u>, 547 F.3d 406, 425 (2d Cir.
2008).  In addition to the four corners of the complaint, the
court may also consider "documents appended to the complaint or
incorporated in the complaint by reference, as well as []
matters of which judicial notice may be taken." <u>Automated
Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.</u>, 155
F.3d 59, 67 (2d Cir. 1998).


I.   Timeliness of Securities Act Claims

     For ten of the twenty-nine securities at issue in this
suit, NCUA alleges claims under Section 11 or Section 12(a)(2)
of the Securities Act of 1933 (referred to in this Opinion as
"Securities Act claims").[7]  Although the parties agree that these
claims are untimely under current Second Circuit precedent, a
brief discussion of the Securities Act claims is relevant to the
state law claims discussed below.

     Section 13 of the Securities Act sets forth the time
limitations that generally apply to claims under Section 11 or
Section 12(a)(2).  Titled "Limitation of Actions," Section 13

---

[7] These ten securities are MSML 2006-8AR, MSML 2006-9AR, MSML
2006-10SL, MSML 2006-13ARX, MSML 2006-16AX (for both Southwest
and Members United), MSML 2007-2AX, MSML 2007-4SL, MSML 2007-
5AX, and MSML 2007-11AR.

provides:

> No action shall be maintained to enforce any liability
> created under section 77k [Section 11] or 77*l*(a)(2)
> [Section 12(a)(2)] of this title unless brought within
> one year after the discovery of the untrue statement
> or the omission, or after such discovery should have
> been made by the exercise of reasonable diligence
> . . . . In no event shall any such action be brought
> to enforce a liability created under section 77k or
> 77*l*(a)(1) of this title more than three years after
> the security was bona fide offered to the public, or
> under section 77*l*(a)(2) of this title more than three
> years after the sale.

15 U.S.C. § 77m. Thus, under Section 13, a suit alleging that a

defendant violated either Section 11 or Section 12(a)(2) must be

filed (a) within one year of the date that the plaintiff

discovered the violation, or (b) within three years of the date

that the security was offered to the public, whichever is

earlier. When differentiating these two time limits, the latter

is called the "statute of repose." FHFA v. UBS Americas Inc.,

712 F.3d 136, 140-41 (2d Cir. 2013) ("UBS II"); P. Stoltz Family

P'ship L.P. v. Daum, 355 F.3d 92, 102 (2d Cir. 2004).

Of the ten securities for which Securities Act claims are

brought, the latest date of purchase is June 21, 2007.

Accordingly, under Section 13's statute of repose, an ordinary

party bringing these Securities Act claims would have been

required to file suit by June 20, 2010 at the latest in order to

avoid complete dismissal. The NCUA has, however, a special

statutory provision that extends the time period for it to bring

suit.


   A. NCUA Extender Statute

   Codified in the Federal Credit Union Act, a statutory

provision (referred to in this Opinion as the "NCUA Extender

Statute") provides:

> (A) In general -- Notwithstanding any provision of any
>     contract, the applicable statute of limitations with
>     regard to any action brought by the [NCUA] Board as
>     conservator or liquidating agent shall be --
>     (i) in the case of any contract claim, the longer
>     of --
>          (I) the 6-year period beginning on the date
>            the claim accrues; or
>          (II) the period applicable under State law;
>            and
>     (ii) in the case of any tort claim, the longer of
>     --
>          (I) the 3-year period beginning on the date
>            the claim accrues; or
>          (II) the period applicable under State law.
>
> (B) Determination of the date on which a claim accrues
>     -- For purposes of subparagraph (A), the date on
>     which the statute of limitations begins to run on
>     any claim described in such subparagraph shall be
>     the later of --
>     (i) the date of the appointment of the [NCUA]
>     Board as conservator or liquidating agent; or
>     (ii) the date on which the cause of action
>     accrues.

12 U.S.C. § 1787(b)(14).  This language is identical in all

material respects to the "Extender Statute" for FHFA, referred

to in this Opinion as the "FHFA Extender Statute," contained in

12 U.S.C. § 4617(b)(12).

In UBS II, the Second Circuit held that the FHFA Extender Statute applies to all claims -- state or federal.  712 F.3d at 142.  In so holding, the Circuit emphasized the "plain meaning" of the FHFA Extender Statute, which states that "'the' statute of limitations for 'any action' brought by FHFA as conservator 'shall be' as specified in § 4617(b)(12)."  Id. at 141 (emphasis in original).  The import of these words, held the Circuit, is that the FHFA Extender Statute applies to any time limitation, whether the limitation is found in state or federal law.  Id. at 142.

Additionally, in considering the legislative history of the FHFA Extender Statute, the Second Circuit stated that "Congress enacted [Housing and Economic Recovery Act of 2008 ("HERA")] and created FHFA in response to the housing and economic crisis," noting that "Congress intended FHFA to take action to 'collect all obligations and money due' to the GSEs, to restore them to a 'sound and solvent condition.'"  Id. (quoting 12 U.S.C. §§ 4617(b)(2)(B)(ii),(D)).  "Congress enacted HERA's extender statute to give FHFA the time to investigate and develop potential claims on behalf of the GSEs -- and thus it provided for a period of at least three years from the commencement of a conservatorship to bring suit."  Id.

In making this statement, the Second Circuit observed in a

13

footnote that "Congress drew the language of § 4617(b)(12) from
similar provisions in the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. §
1821(d)(14), and the Federal Credit Union Act, 12 U.S.C. §
1787(b)(14)."  Id. at 142 n.2.  Section 1787(b)(14) of the
Federal Credit Union Act is quoted at length above and is the
NCUA Extender Statute.  Moreover, the Second Circuit observed
that this language had been construed in the context of FIRREA
as having the purpose of providing an analogous agency, the
Resolution Trust Corporation, with additional time to
investigate and determine what causes of action it should bring
on behalf of a failed institution.  The Second Circuit imported
that line of reasoning to its analysis of the FHFA Extender
Statute, stating that "[i]n drawing on FIRREA's language,
Congress intended for § 4617(b)(12) of HERA to serve a similar
purpose with respect to FHFA."  Id.

     Finally, the Second Circuit rejected the argument that the
FHFA Extender Statute applied only to "statutes of limitations"
and not to "'statutes of repose' such as those contained in the
Securities Act and the Virginia and D.C. Blue Sky laws."  Id. at
142.  Noting that courts and legislatures generally use the term
"statute of limitations" to refer to statutes of repose, and
applying the plain meaning of the statute and its legislative

history, the Second Circuit concluded that the FHFA Extender
Statute applies to any statute of repose contained in the
federal or state securities laws.  Id. at 142-44.

The Second Circuit's analysis of the FHFA Extender Statute
in UBS II applies equally to the NCUA Extender Statute, for at
least two reasons.  First, the two provisions are materially
identical, and thus Congress is presumed to have intended for
both provisions to have the same legal effect.  See United
States v. Robinson, 702 F.3d 22, 33-34 (2d Cir. 2012).  Second,
as the Second Circuit explained in UBS II, because the FHFA
Extender Statute was drawn from the NCUA Extender Statute, this
is compelling evidence that Congress actually intended for both
statutes to serve similar purposes.  Accordingly, this Court
holds that (1) the NCUA Extender Statute applies to both federal
and state claims; and (2) that the NCUA Extender Statute applies
to any statute of repose contained in those federal and state
claims.  See also NCUA v. Nomura Home Equity Loan, Inc., 727
F.3d 1246 (10th Cir. 2013) (reaching the same conclusions).

Morgan Stanley objects to this conclusion on two grounds,
neither of which is persuasive.  First, it contends that the UBS
II holding should be limited to the FHFA Extender Statute
because some parts of the UBS II decision made reference to the
"housing and financial crisis" and the problems of a "new

15

agency" -- concerns that are not applicable to the NCUA, which neither was created in response to the housing and financial crisis nor is a new agency. These references in <u>UBS II</u>, however, may be read as an explanation of why the purpose of extender statutes, as they have been construed in context of FIRREA and the Federal Credit Union Act, applies equally to the FHFA.

Second, Morgan Stanley asserts that the NCUA Extender Statute should not apply to statutes of repose contained in state law claims because of the presumption against congressional preemption of state law. This argument fails, as the plain text of the NCUA Extender Statute -- wherein Congress stated that "<u>the</u> applicable statute of limitations with regard to <u>any</u> action" brought by NCUA "shall be" three years, 12 U.S.C. § 1787(b)(14) (emphasis added); <u>see</u> <u>UBS II</u>, 712 F.3d at 141-42 (emphasizing the same language in the FHFA Extender Statute) -- overrides this presumption. Through this language, Congress expressed its intent to preempt state law. See <u>Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.</u>, 673 F.3d 84, 95 (2d Cir. 2012).

Morgan Stanley's only cited authority is a Central District of California decision that held that the FIRREA Extender Statute, 12 U.S.C. § 1821(d)(2)(A) -- which is identical to the

NCUA Extender Statute -- does not apply to the 5-year statute of repose under the Texas Blue Sky Law.  In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig., 2013 WL 4536177, at *4-*9 (C.D. Cal. Aug. 26, 2013).  That decision, however, is easily distinguished.  The In re Countrywide court's conclusion was dictated by prior Ninth Circuit law holding that "that the term 'statute of limitation' was ambiguous regarding whether it included statutes of repose" when Congress passed FIRREA in 1989.  McDonald v. Sun Oil Co., 548 F.3d 774, 781 (9th Cir. 2008).  The Second Circuit, however, has held that the term "statute of limitation" in the FHFA Extender Statute and, by extension, the NCUA Extender Statute, encompasses statutes of repose.  Thus, the NCUA Extender Statute preempts statutes of repose contained in state law claims.

B. Expired Securities Act Claims

This case, however, raises an issue that was not present in the FHFA litigation.  In the FHFA cases, the three-year statute of repose had not expired on the date when FHFA became conservator of the GSEs.  Because the three-year statute of repose on Securities Act claims had not run by that date, the FHFA was able to take advantage of its Extender Statute and an additional three years were made available for the FHFA to bring

suit.[8]

Here, by contrast, on the date when NCUA took over as conservator for the Credit Unions, which was September 24, 2010, three years had already passed from the date of the last security purchase, which was June 21, 2007.  Morgan Stanley contends, and NCUA does not dispute, that the Extender Statute applies only to open claims and cannot resuscitate claims that have expired.  Thus, NCUA cannot take advantage of the additional three years provided by its Extender Statute, unless it can toll the three-year statute of repose such that its Securities Act claims were also open on September 24, 2010.

In its complaint, NCUA seeks to invoke American Pipe tolling.  See Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974) ("American Pipe").  In American Pipe, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  Id. at 554.  For all

---

[8] The defendants in the FHFA litigation, as do the defendants here, intend to argue that the plaintiff's Securities Act claims are nonetheless barred by the relevant statute of limitations because the Credit Unions should have discovered the facts constituting a violation earlier.  As explained below, that affirmative defense is not amenable to resolution on a motion to dismiss.

ten securities for which it brings Securities Act claims, NCUA
has identified one or more class action lawsuits that were
commenced prior to the expiration of the three-year time period
for each security and that, if American Pipe tolling applied to
the three-year statute of repose, would toll that statute of
repose through the date when NCUA became conservator for the
Credit Unions, thus triggering the NCUA Extender Statute and
making the Securities Act claims timely.

    The Second Circuit recently held, however, that American
Pipe tolling does not apply to the three-year statute of repose
for Securities Act claims.  Police & Fire Ret. Sys. Of Detroit
v. IndyMac MBS, Inc., 721 F.3d 95, 109 (2d Cir. 2013).  NCUA
does not dispute that this Court is bound by IndyMac, and
correspondingly that its Securities Act claims are untimely and
subject to dismissal in the Second Circuit.  NCUA has reserved
the right to assert the Securities Act claims, should IndyMac be
reversed or vacated.  The motion to dismiss is therefore granted
with respect to the Securities Act claims.


II.  Timeliness of Illinois Claims

    For seven securities, NCUA alleges claims under the
Illinois Blue Sky Law (referred to in this Opinion as "Illinois

19

claims").[9]  Morgan Stanley contends that the Illinois claims are
untimely for two reasons.  First, the claims are facially
untimely as NCUA has failed to plead affirmatively why its
claims meet the three-year statute of limitations under the
Illinois Blue Sky Law.  Second, NCUA failed to comply with the
six-month notice requirement of the Illinois Blue Sky Law.  Both
arguments fail.

  A. Illinois Three-Year Statute of Limitations

     The limitations provision of the Illinois Blue Sky Law
reads as follows:

> D. No action shall be brought for relief under this
> Section or upon or because of any of the matters for
> which relief is granted by this Section after 3 years
> from the date of sale; provided, that if the party
> bringing the action neither knew nor in the exercise
> of reasonable diligence should have known of any
> alleged violation of subsection E, F, G, H, I or J of
> Section 12 of this Act which is the basis for the
> action, the 3 year period provided herein shall begin
> to run upon the earlier of:
>
>     (1) the date upon which the party bringing the
>     action has actual knowledge of the alleged
>     violation of this Act; or
>
>     (2) the date upon which the party bringing the
>     action has notice of facts which in the exercise
>     of reasonable diligence would lead to actual
>     knowledge of the alleged violation of this Act.

[9] The seven securities are MSCI 2006-HE2-U9, MSCI 2006-HE2-W5,
MSML 2006-16AX (purchased by Members United), MSML 2007-2AX,
MSML 2007-4SL, MSML 2007-5AX, and MSML 2007-11AR.

815 Ill. Comp. Stat. Ann. 5/13(D).  Prior to August 5, 2013, the limitations provision also included a five-year statute of repose.[10]  As this case was filed after that date, only a three-year statute of limitations is operative.

Although Morgan Stanley styles its argument as being a substantive challenge based on the expiration of the three-year statute of limitations, its actual contention is addressed to the adequacy of the pleadings.  Specifically, Morgan Stanley contends that NCUA was required to plead (a) when and how it discovered the facts upon which it bases its complaint, and (b) why it could not have discovered those facts sooner.

This argument fails.  Pleading in federal court is dictated by rules of federal procedure.  See generally Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).  Under the Federal Rules of Civil Procedure, a plaintiff need not affirmatively plead the timeliness of his claims.  Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007).  Accordingly, the Illinois claims are not barred by the three-year statute of limitations.

---

[10]  The previous language in 815 Ill. Comp. Stat. Ann. 5/13(D)(2) read: "the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable."

B. Illinois Six-Month Notice Requirement

Resolving Morgan Stanley's second argument requires a more detailed discussion.  In order to seek rescission of a purchased security under the Illinois Blue Sky Law, a plaintiff must comply with a six-month notice requirement that reads as follows:

> <u>Notice</u> of any election provided for in subsection A of this Section <u>shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale</u> of the securities to him or her <u>is voidable</u>, to each person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service.

815 <u>Ill. Comp. Stat. Ann.</u> 5/13(B) (emphasis added).

In describing the notice of an election, this section refers to "subsection A."  The remedy provided under subsection A is that of rescission.  <u>See, e.g.</u>, <u>Benjamin v. Cablevision Programming Invs.</u>, 499 N.E.2d 1309, 1312-13 (Ill. 1986) ("Under section 13 of the Act, a purchaser may rescind a sale of securities made in violation of the provisions of the Illinois Securities Act . . . ."); <u>Renovitch v. Stewardship Concepts, Inc.</u>, 654 F. Supp. 353, 359 (N.D. Ill. 1987) ("It is well established that the only civil remedy provided by the Illinois Securities Act is rescission of the sale; courts have refused to imply a damage remedy.").  Subsection A provides:

> A. <u>Every sale of a security made in violation of the</u>
> <u>provisions of this Act shall be voidable at the</u>
> <u>election of the purchaser exercised as provided in</u>
> <u>subsection B of this Section</u>; . . . and each
> underwriter, dealer or salesperson who shall have
> participated or aided in any way in making the sale .
> . . shall be jointly and severally liable to the
> purchaser as follows:
>
>> (1) for the full amount paid, together with
>> interest . . .; or
>>
>> (2) if the purchaser no longer owns the
>> securities, for the amounts set forth in
>> clause (1) of this subsection A less any amounts
>> received by the purchaser for or on account of
>> the disposition of the securities. . . .

815 <u>Ill. Comp. Stat. Ann.</u> 5/13(A) (emphasis added).  Thus,

a purchaser is required to give notice within six months

after it has "knowledge that the sale  . . . is voidable"

of its election to rescind the sale.

According to the definitive treatise of the Illinois

Securities Act of 1953, which added the six-month notice

requirement to the Illinois Blue Sky Law:

> [t]he purpose of this change is to cut down the
> liability period, primarily with respect to
> inadvertent violations, so that the purchaser of
> securities sold in violation of the law cannot wait
> for the entire period of the statute of limitations to
> decide whether or not to bring suit.

Samuel H. Young, <u>Interpretive Comments and Notes on Sections of</u>

<u>the Securities Law of 1953 as Amended</u>, S.H.A. Ch. 121 1/2,

Appendix, at 630 (1960).  As Young explains, the purpose of the

notice requirement is to prevent purchasers from adopting a

wait-and-see tactic, whereby the purchaser who knows that he can seek rescission of a securities sale decides instead to wait out the three-year limitations period to see whether the securities rise in value.  See id.

Morgan Stanley argues that, even if the filing of this lawsuit on September 23, 2013 were deemed notice of an election to rescind a purchase, Members United and NCUA had constructive knowledge of the voidability of the seven securities long before March 23, 2013, rendering the Illinois claims untimely.  Morgan Stanley points to the downgrades of these securities in 2008, the vast amount of public information on RMBS issues during the years following the housing and financial crisis, and the 2011 filing of an RMBS lawsuit by NCUA in the District of Kansas, albeit one that included claims on different securities than those present here.  See NCUA v. J.P. Morgan Secs. LLC, No. 11-cv-2341 (D. Kan. filed June 20, 2011).  NCUA responds that it does not have knowledge of the voidability of the challenged securities while its suit challenging those securities is pending, and that, in any event, the NCUA Extender Statute displaces or preempts the six-month notice requirement.

The NCUA Extender Statute preempts the six-month notice requirement in the Illinois Blue Sky Law.  Preemption is a question of congressional intent, which is generally expressed

through the text and structure of the statute in question. Niagra Mohawk Power Corp., 673 F.3d at 95. While the text and structure of the NCUA Extender Statute do not explicitly evince an intent by Congress to displace or preempt a six-month notice requirement in the Illinois Blue Sky Law, they do support a finding that the application of the Illinois law during the period of the conservatorship is barred by the doctrine of obstacle preemption.

The NCUA Extender Statute is textually limited to "the applicable statute of limitations." 12 U.S.C. § 1787(b)(14). The Illinois six-month notice requirement is akin to but is not precisely a "statute of limitations" for at least two reasons. It is not labeled a "statute of limitations" and it does not function as a statute of limitations. The notice provision is found in subsection B of the Illinois Blue Sky Law and not in subsection D, which includes the three-year statute of limitations. Cf. 815 Ill. Comp. Stat. Ann. 5/13(D). And significantly, a plaintiff who provides timely notice within six months of knowledge of the voidability of certain securities retains the right to file suit within three years from the date the claim accrued. Although failure to provide timely notice will bar suit, the notice requirement is more properly categorized as a "condition precedent" than a "statute of

25

limitations."  See Fishman by Fishman v. Delta Air Lines, Inc.,
132 F.3d 138, 143 (2d Cir. 1998) (distinguishing conditions
precedent from statutes of limitation).  Indeed, an analogous
notice requirement under New York law, which bars certain suits
against the City of New York unless notice of the claim was
provided within ninety days after the claim arises, N.Y. Gen.
Mun. Law § 50-e, has been described by both the New York Court
of Appeals and the Second Circuit as a "condition precedent" as
opposed to a "statute of limitations."  See, e.g., Campbell v.
City of New York, 825 N.E.2d 121, 123 n.2 (N.Y. 2005); Hardy v.
New York City Health & Hospital Corp., 164 F.3d 789, 793 (2d
Cir. 1999).  Thus, because the NCUA Extender Statute is
textually limited to "the applicable statute of limitations,"
there is no direct conflict with the Illinois Blue Sky Law six-
month notice requirement, which is not a statute of limitations.

There is a second preemption doctrine, however, that does
apply here.  Under obstacle preemption, "a state law is
preempted where it stands as an obstacle to the accomplishment
and execution of the full purposes and objectives of Congress."
Arizona v. United States, 132 S. Ct. 2492, 2505 (2012) (citation
omitted).  "[T]he purpose of Congress is the ultimate
touchstone" in this analysis, In re Methyl Tertiary Butyl Ether
(MTBE) Products Liability Litig., 725 F.3d 65, 101 (2d Cir.

26

2013) (quoting Wyeth v. Levine, 555 U.S. 555, 565 (2009)), and "the conflict between state law and federal policy must be a sharp one." Id. (citation omitted). "A showing that the federal and state laws serve different purposes cuts against a finding of obstacle preemption." Id. (citation omitted). "The burden of establishing obstacle preemption . . . is heavy: [t]he mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." Id. at 101-02 (citation omitted).

The six-month notice requirement in the Illinois Blue Sky Law and the three-year statute of limitations in the NCUA Extender Statute address similar issues, arise from similar concerns, and have similar purposes. Both are addressed to timeliness of litigation and the amount of time a claimant may use to investigate a claim and decide what course to pursue. Through passage of the Illinois statute, the legislature has decided that any claimant who knows she may seek rescission of sale because it is voidable, must give notice of that intention to seek rescission within six months of acquiring that knowledge or forever be barred from seeking rescission in court proceedings. Through the federal statute, Congress has decided that the NCUA shall be given three years from the commencement

of a conservatorship to decide what claims to pursue on behalf of the financially distressed credit union over which it has just been given control.  Because both these statutes are addressed to issues of staleness and diligence in the pursuit of claims, there is no barrier to finding that obstacle preemption exists to the extent that Morgan Stanley is relying on the Illinois statute to shorten the period of time within which NCUA must act.  Congress intended for NCUA to have three years to investigate those claims that were open on the date of conservatorship, and enforcement of the Illinois statute during that period is preempted by the NCUA Extender Statute.  See UBS II, 712 F.3d at 142.

The purposes of the NCUA Extender Statute and the six-month notice requirement in the Illinois Blue Sky law do not conflict, however, in those circumstances in which the sixth-month period of time to give notice of an intent to rescind had already run before the commencement of the conservatorship.  After all, the NCUA Extender Statute does not resuscitate barred claims; it merely extends the statute of limitations for open claims by three years.  See United States v. Lauersen, 648 F.3d 115, 116 (2d Cir. 2011) ("Generally, we presume that Congress expresses its intent through the language it chooses.").

Accordingly, the Court turns to Morgan Stanley's contention

28

that the Illinois Blue Sky Law claims are untimely due to non-compliance with the six-month notice requirement prior to the commencement of the conservatorship.  To evaluate this question, it must be determined when the six-month period was triggered, i.e., when Members United acquired "knowledge" of the "voidability" of the challenged securities and the ability to seek rescission under the Illinois Blue Sky Law.

The Illinois Supreme Court has not analyzed the six-month notice requirement.  It is generally the duty of this Court in such circumstances to predict how that court would construe the six-month notice requirement.  In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013).  "In making this prediction, [a court] give[s] the fullest weight to pronouncements of the state's highest court while giving proper regard to relevant rulings of the state's lower courts."  Runner v. New York Stock Exch., Inc., 568 F.3d 383, 386 (2d Cir. 2009) (citation omitted).  The holding of "an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  West v. AT&T, 311 U.S. 223, 237 (1940).  "Other data include relevant case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and

any other resources available to the state's highest court."
Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 399 (2d Cir.
2001) (citation omitted).

The parties rely almost exclusively on three Illinois
intermediate appellate court decisions from between 1982 and
1985. Witter v. Buchanan, 476 N.E.2d 1123 (Ill. App. Ct. 1st
Dist. 1985); Buehl v. Dayson, 469 N.E.2d 403, 408 (Ill. App. Ct.
5th Dist. 1984); Frendreis v. Fin. Concepts, Ltd., 435 N.E.2d
1304 (Ill. App. Ct. 1st Dist. 1982). The holdings in these
cases, however, arose from challenges based on unregistered
securities and the particular circumstances confronted in each
case. Many federal district courts sitting in the Seventh
Circuit have applied the holdings from these intermediate state
appellate court decisions to claims alleging material
misrepresentations. Any prediction of how the Illinois Supreme
Court might interpret the notice requirement will require a
close review of the text and purpose of the six-month notice
requirement, as well as an examination of how the statute will
likely be applied by that Supreme Court in the context of a
claim of material misrepresentation in offering documents for
registered securities.[11]

---

[11] Certification of this issue to the Illinois Supreme Court does
not appear to be possible because that court accepts

While the issue may be amenable to early resolution through summary judgment practice on, for example, stipulated facts, as a matter of federal pleading law the motion to dismiss the Illinois claims on the basis of the six-month notice requirement must be denied.  As stated above, an affirmative defense based on timeliness cannot be granted at the motion to dismiss stage unless it is apparent from the face of the complaint and judicially noticeable facts.  It is not apparent from the complaint that Members United acquired knowledge of the voidability of the challenged securities and the ability to seek rescission under the Illinois Blue Sky Law prior to March 23, 2013.  Accordingly, the motion to dismiss the Illinois claims on the basis of the six-month notice requirement is denied.

III. Timeliness of Texas Claims

NCUA alleges violations of the Texas Blue Sky Law for twenty-one securities (referred to in this Opinion as "Texas claims").[12]  Morgan Stanley contends that the Texas claims are

---

certification only from the United States Supreme Court and the Seventh Circuit.  See Ill. Sup. Ct. R. 20.

[12] These twenty-one securities are MSABSCI 2006-HE4-C8, MSABSCI 2006-HE4-E4, MSABSCI 2006-HE6, MSABSCI 2006-HE8, MSABSCI 2006-NC4, MSABSCI 2006-WMC2, MSABSCI 2007-HE4, MSABSCI 2007-HE5, MSHEL 2006-1, MSHEL 2007-2, MSIXISREC 2006-1, MSML 2005-11AR, MSML 2006-3AR, MSML 2006-8AR, MSML 2006-9AR, MSML 2006-10SL,

untimely for two reasons.  First, the claims are barred by the Texas Blue Sky Law's five-year statute of repose.  Second, the claims are untimely under Texas's three-year statute of limitations.  Both arguments fail.

The argument related to the five-year statute of repose may quickly be addressed.  The earliest purchase date of the challenged securities by Southwest was December 21, 2005. Because the statute of repose was due to expire on these claims on December 21, 2010, these claims had not expired when Southwest was placed into conservatorship on September 24, 2010. Accordingly, the NCUA Extender Statute, as explained above, extended the time to bring suit on claims by three years to September 24, 2013.  Because this suit was filed on September 23, 2013, the statute of repose in the Texas Blue Sky Law imposes no bar to the Texas claims.  Morgan Stanley's arguments to the contrary have been addressed and rejected above.

The argument related to the three-year statute of limitations requires more discussion.  Morgan Stanley contends that the three-year statute of limitations for the Texas claims expired before September 23, 2010 because the Credit Unions were on inquiry notice of potential claims.  NCUA argues that the

---

MSML 2006-13ARX, MSML 2006-16AX, NREC 2007-HE2, RALI 2006-QA5, and SAS 2007-2.

three-year period was not triggered more than three years earlier, i.e., before September 23, 2007, because a reasonably diligent plaintiff would not have then possessed sufficient information to plead adequately the claims in the complaint.

The Texas Blue Sky Law limitations provision reads as follows: "No person may sue under Section 33B or 33F so far as it relates to Section 33B . . . more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence." Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(3)(a). Neither the Texas Supreme Court nor the intermediate appellate courts have construed when a claim accrues under this limitations provision. Thus, under the same principles set forth above, this Court must predict how the Texas Supreme Court would construe the limitations provision.

The Texas Supreme Court would adopt the accrual test that applies to Securities Act claims. The language in the Texas limitations provision is materially identical with the one-year statute of limitations in the Securities Act, which states that claims must be filed "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. This similarity is not accidental. The Texas

33

Securities Act was enacted in 1935 and modeled after the Federal Securities Act of 1933.  Flowers v. Dempsey-Tegeler & Co., 472 S.W.2d 112, 114 (Tex. 1971) ("It seems clear that Section 33 of The Texas Securities Act was lifted almost verbatim from Section 12 of the 1933 Federal Act codified as 15 U.S.C.A. § 77*l* (1971).").  Moreover, the "Purpose" provision of the Texas Blue Sky Law states that the law "may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration, particularly with respect to: (1) procedure . . . ."  Tex. Rev. Civ. Stat. Ann. art. 581, § 10-1(A)(1).

Accordingly, Texas courts have generally adopted federal securities law when analyzing materially identical provisions between the two statutes.  See Searsy v. Commercial Trading Corp., 560 S.W.2d 637, 639-42 (Tex. 1977); Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc., 12 S.W.3d 859, 868 (Tex. App. Ct. 2000) ("Because the Texas Securities Act is so similar to the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas Act."); Campbell v. C.D. Payne & Geldermann Secs., Inc., 894 S.W.2d 411, 417–18 (Tex. App. Ct 1995) ("It is the rule that, because of the obvious similarities between the Texas Securities Act and the federal Securities

34

Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas act.").[13]   It is therefore appropriate to look to the federal construction of the identical language.  <u>See</u> <u>FHFA v. UBS</u>, 858 F. Supp. 2d 306, 317-22 (S.D.N.Y. 2012) ("UBS I").

In <u>Merck & Co. v Reynolds</u>, 559 U.S. 633, 651-52 (2010), the Supreme Court held that the limitations provision for Exchange Act claims "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation' -- whichever comes first."  <u>Id.</u> at 653.  The Second Circuit subsequently explained that a fact is not "discovered" for the purposes of Exchange Act claims until "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  <u>City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.</u>,

---

[13] Where Texas intermediate appellate courts have declined to follow federal securities law, they have relied on the fact that there were material differences between the Texas Blue Sky Law and the provision of the federal securities laws at issue in the case.  <u>See</u> <u>Allen v. Devon Energy Holdings, L.L.C.</u>, 367 S.W.3d 355, 400 n.62 (Tex. Ct. App. 2012) (comparing language in Texas statute to that in Sarbanes-Oxley, 28 U.S.C. § 1658(b)), <u>vacated on appeal by agreement under Tex. R. App. P. 56.3</u>, 2013 WL 273026; <u>Baxter v. Gardere Wynne Sewell LLP</u>, 182 S.W.3d 460, 464 (Tex. Ct. App. 2006) (rejecting the plaintiffs' contention that inquiry notice requires defendant-by-defendant analysis, noting "differences between the federal law and Texas law" that "justify treating the [Texas] discovery rule differently").

637 F.3d 169, 175 (2d Cir. 2011).  For the reasons explained in UBS I, 858 F. Supp. 2d at 317-20, it follows that the City of Pontiac test should apply to Securities Act claims.  And, because the same test should apply to the Texas Blue Sky Law claims, this Court holds that the statute of limitations for NCUA's Texas claims did not begin to run until "a reasonably diligent plaintiff" in the Credit Unions' position would have had "sufficient information about [a given misstatement or omission] to adequately plead it in a complaint."  City of Pontiac, 637 F.3d at 175.

Applying this test here, the Texas claims are timely.  As the NCUA Extender Statute would extend and make timely any Texas claims for which the three-year statute of limitations had not run as of September 24, 2010, the only question is whether the statute of limitations was triggered prior to September 24, 2007.  It was not.  As explained in the related FHFA litigation, the first ratings downgrade below investment grade may be a triggering event for the statute of limitations in this RMBS litigation.  UBS I, 858 F. Supp. 2d at 320-22; see also FHFA v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 500 (S.D.N.Y. 2012) ("JPMorgan").  The earliest such downgrade of the challenged securities in this case did not occur until August 2008.  Accordingly, if the three-year statute of limitations began to

run in August 2008, the Texas claims were open at the initiation of the conservatorship on September 24, 2010, and are thus timely filed in this action.

In response, Morgan Stanley mostly repeats arguments that are close variations of ones that this Court considered and rejected in two related FHFA cases.  UBS I, 858 F. Supp. 2d at 320-22; JPMorgan, 902 F. Supp. at 499-500.  For example, Morgan Stanley argues that certain NCUA reports, SEC and other federal filings, and other press reports issued prior to September 2007 described substantial concerns with originators in the mortgage industry -- including New Century Mortgage Corporation, which originated some of the Certificates at issue in this case -- that should have triggered the statute of limitations.  As explained in UBS I, as the information contained in such reports pertained to originators, not Morgan Stanley or the other defendants in these NCUA actions, this information was insufficient to trigger the statute of limitations.  See 858 F. Supp. 2d at 320-22.  Moreover, even in the face of knowledge that many of the originators supplying loans to these securitizations engaged in dubious underwriting practices, the Credit Unions "were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials."

37

Id. at 321.[14]

Additionally, Morgan Stanley points to ratings downgrades of certain subordinate tranches of the Certificates at issue here.  As explained in JPMorgan, this argument fails for three reasons.  First, it relies on information not alleged in the complaint.  Second, it does not establish a key requirement for a triggering of the statute of limitations, namely that such information was sufficient on its own to enable NCUA to plead a securities violation capable of surviving a motion to dismiss.  Third, and perhaps most important, downgrades in subordinate tranches were not unexpected, given that the purpose of such subordinate tranches is to suffer losses before the Certificates that the Credit Unions had purchased.  As such, these downgrades would not necessarily lead the Credit Unions to suspect that their Certificates would also be downgraded.  JPMorgan, 902 F. Supp. 2d at 500.[15]

---

[14] Morgan Stanley places special emphasis on the NCUA reports, as if the fact of NCUA's authorship should alter this analysis.  It does not.  The question for triggering the statute of limitations is whether the Credit Unions had sufficient information to adequately plead a securities violation.  From the perspective of the Credit Unions, the NCUA reports regarding the mortgage industry were no different from reports authored by any other organization.

[15] Morgan Stanley attempts to distinguish JPMorgan by asserting, in a footnote, that the primary and subordinate Certificates here shared a greater portion of loans than those in JPMorgan.

Morgan Stanley argues in the alternative that the claims are untimely under an "inquiry notice" standard applicable to the Texas Blue Sky Law.  The argument proceeds as follows: even if NCUA did not have sufficient information to plead a securities law violation, it had sufficient information to begin to investigate the possibility of such a violation prior to September 23, 2007.  Its failure to begin an investigation, which NCUA does not dispute, triggers the statute of limitations.

The inquiry notice standard, however, is inapplicable, given this Court's prior determination that the <u>Merck</u> standard applies to the Texas claims.  In <u>Merck</u>, the Supreme Court considered and rejected the exact argument that Morgan Stanley makes here, stating that such a standard is irreconcilable with the language of the limitations provision, "which simply provides that 'discovery' is the event that triggers the [] limitations period -- for all plaintiffs."  559 U.S. at 652.

Morgan Stanley's only authority is a Fifth Circuit decision, <u>Margolies v. Deason</u>, 464 F.3d 547, 553 (5th Cir. 2006), which described the language in the Texas statute of limitations as an "inquiry notice" standard.  <u>Margolies</u>,

---

A debate between the parties in footnotes to their briefs will not be further addressed here.

however, predates Merck, which held that such language, as used
in the Exchange Act, does not set forth an inquiry notice
standard.  Moreover, the cited authority in Margolies is a 1988
Fifth Circuit decision applying an inquiry notice standard for
Exchange Act claims specifically.  Jensen v. Snellings, 841 F.2d
600, 607 (5th Cir. 1988).  As it is now clear that inquiry
notice is inapplicable for Exchange Act claims, Jensen is no
longer good law, and Margolies is, in turn, not persuasive
authority.  Accordingly, as with the Illinois claims, the motion
to dismiss will not be granted as to the Texas claims on the
timeliness defenses.


IV.  Adequacy of Pleadings

        Morgan Stanley's final argument in support of dismissal,
which applies to all securities claims, is that they are
inadequately pled.  Because NCUA does not allege that the
defendants engaged in fraud, its pleadings are governed by
Federal Rule of Civil Procedure 8(a)(2), which requires that the
complaint contain a "short and plain statement of the claim
showing that the pleader is entitled to relief."  As explained
above, the claim must be "plausible on its face."  Iqbal, 556
U.S. at 678.

        The complaint asserts claims under Sections 11 and 12(a)(2)

40

of the Securities Act.  Section 11 provides a private cause of
action against the issuers and other signatories of a
registration statement that "contained an untrue statement of a
material fact or omitted to state a material fact required to be
stated therein or necessary to make the statements therein not
misleading."  15 U.S.C. § 77k(a).  A fact is material for the
purposes of Section 11 if "there is a substantial likelihood
that a reasonable shareholder would consider it important in
deciding how to act."  Hutchison v. Deutsche Bank Secs. Inc.,
647 F.3d 479, 485 (2d Cir. 2011) (citation omitted).  Section
12(a)(2) imposes liability under similar circumstances with
respect to prospectuses and oral communications.  15 U.S.C.
§ 77*l*(a)(2).  Neither provision requires allegations of
scienter, reliance, or loss causation in order to state a claim.
Fait v. Regions Fin. Corp., 655 F.3d 105, 109 (2d Cir. 2011).
The same standard applies to the Illinois and Texas claims.  See
815 Ill. Comp. Stat. Ann. 5/12 & 13; Tex. Rev. Civ. Stat. Ann.
art. 581, § 33.  In the context of claims arising under the
Securities Act and parallel state laws, Rule 8(a) "place[s] a
relatively minimal burden on the plaintiff."  NECA−IBEW Health &
Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 157 (2d Cir.
2012) (citation omitted).

　　　　As noted above, NCUA identifies two principal categories of

what it argues is misleading or false information in the offering materials that accompanied the RMBS at issue here. First, NCUA maintains that the offering materials represented that the underlying mortgage loans were underwritten according to certain risk guidelines when, in fact, there were pervasive and systematic breaches of those guidelines.  Second, NCUA asserts that the offering documents misstated the loan-to-value (LTV) ratio of the underlying mortgage pools, the percentage of properties in the supporting loan groups that were owner occupied, and borrowers' debt-to-income (DTI) ratio.  Morgan Stanley contends that the complaint fails to state a claim with respect to both categories of statements.

The allegations in NCUA's complaint raise a plausible inference of material falsity by Morgan Stanley and the defendants with regard to both categories of statements.  To support its assertion that the loans did not comply with underwriting guidelines, NCUA points to the surge in mortgage delinquency and defaults for the loans in the RMBS securities shortly after the offerings were made, the surge in actual losses versus expected losses on these offerings, and the downgrade of the challenged securities in 2008 and 2009.  It links those security-specific allegations to originator-specific allegations -- supported by government reports, court filings,

other publicly available information -- of how the originators
responsible for many of the loans included in the challenged
securities systematically failed to comply with their reported
underwriting practices.  This linkage raises a plausible
inference of a material misstatement or omission by the
defendants with respect to whether the loans complied with
underwriting practices.  See N.J. Carpenters Health Fund v.
Royal Bank of Scotland Grp., 709 F.3d 109, 122 (2d Cir. 2013)
(adopting the First Circuit's holding in Plumbers' Union Local
No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d
762, 772-74 (1st Cir. 2011), that a sharp drop in credit rating,
combined with specific allegations that the originator
disregarded underwriting guides, is sufficient to survive a
motion to dismiss); JPMorgan, 902 F. Supp. 2d at 488 (accepting
the plausibility of an assertion of material falsity when
generalized reports were linked to security-specific downgrades
in credit rating).[16]

---

[16] Morgan Stanley attempts to distinguish N.J. Carpenters on the
basis that the plaintiff in that case interviewed former
employees of the relevant originator, which the Second Circuit
described as a "substantial source[]" at the motion to dismiss
stage.  709 F.3d at 123.  This attempt fails.  The Second
Circuit expressly adopted the approach of the First Circuit in
Nomura, see N.J. Carpenters, 709 F.3d at 123, where the
allegations were not based on such "substantial sources" but
were nevertheless deemed sufficient because they were
originator-specific.  Nomura, 632 F.3d at 772-74.

43

As to the other category of challenged statements -- LTV ratios, owner-occupancy rates, and DTI ratios -- NCUA points to the same detailed allegations of how originators failed to comply with their reported underwriting practices.  Because the factors that bear on LTV ratios, owner-occupancy, and DTI ratios are closely related to the underwriting guidelines, many of the allegations regarding non-compliance with their underwriting practices also constitute allegations that originators misrepresented LTV ratios,[17] owner-occupancy rates,[18] and DTI ratios.  For example, when NCUA alleges (as it does repeatedly)

---

[17] For any given mortgage, the LTV ratio is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal.  LTV ratio is a measure of credit risk.  The higher the ratio, the less equity the homeowner has in the property, and the more likely she is to default.  Mortgages with an LTV ratio in excess of 100% are "underwater," and are highly susceptible to default, because the homeowner has little financial incentive to continue making payments in the event her financial circumstances change or the value of her home further declines.  Such mortgages are highly risky for note holders, because the value of the property is insufficient to cover the balance of the loan in the event of a default.

[18] Owner-occupancy rates refers to a break-down of the mortgages, provided in a prospectus supplement per supporting loan group, based on whether the property that secured the loan was owner occupied, a second home, or an investment property.  This information was material to investors, because a borrower whose primary residence is the mortgaged property is less likely to default than one who uses it as a second home or as an investment.

that originators inflated appraisal prices, this allegation
pertains both to LTV ratios and compliance with underwriting
guidelines.  Similarly, when NCUA alleges that originators
misstated borrowers' intent to occupy their homes and failed to
determine borrowers' income, this allegation pertains both to
owner-occupancy rates, DTI ratios, and compliance with
underwriting guidelines.  Accordingly, because the allegations
regarding LTV ratios, owner-occupancy rates, and DTI ratios are
originator-specific and linked to downgrades of the challenged
securities, and in light of the "minimal burden" on the
plaintiffs at the pleading stage, these allegations raise a
plausible inference of material misstatements or omissions.

Despite devoting many pages to its contention that NCUA's
claims are inadequately pled, Morgan Stanley makes essentially
only one argument in support of dismissal: that NCUA fails to
support its assertions with a "forensic analysis" of the
challenged loans.  Specifically, Morgan Stanley contends that
NCUA should have conducted an automated valuation model analysis
to support its allegations as to the LTV ratios, that it should
have reviewed public records to support its allegations as to
the owner-occupancy rates, and that it should have analyzed the
relevant loan pools to show departure from the underwriting

45

guidelines.[19]

A close variant of this argument was considered and rejected in both UBS I and JPMorgan.  In those cases, FHFA had conducted a forensic analysis of some loan files, and the defendants contended that the analysis was of too few files to support its allegations of a securities act violation.  The Court rejected defendants' argument but went on to explain why the implicit premise of defendants' argument -- that a forensic review of some sort is essential to state a securities act claim -- is incorrect:

> If defendants were correct that in order to allege the
> falsehood of group-level representations in connection
> with the offering of asset-backed securities, a
> plaintiff must conduct a detailed pre-complaint,
> asset-level analysis, it would be the rare complaint
> that would survive a motion to dismiss.  Indeed, such
> a rule might constitute an insurmountable barrier for
> any private plaintiff.  After all, FHFA was apparently
> able to obtain the loan files it reviewed at least in
> part through recourse to administrative subpoenas.
> Such a requirement would also impose prohibitive costs
> on the would-be plaintiff, essentially requiring her
> to prove her case at the pleading stage, and inverting
> the general rule that it is the producing party who
> must bear the cost of discovery.

---

[19] As NCUA notes, Morgan Stanley suggests in passing, but does not argue, that statements regarding LTV ratios are opinions exempt from liability under the federal and state securities laws, and that statements regarding owner-occupancy are exempt from liability given various warnings included in the offering documents.  These arguments were considered at length and rejected in UBS I.  UBS I, 858 F. Supp. 2d at 324-30.

JPMorgan, 902 F. Supp. 2d at 489-90 (citation and footnotes omitted).  For these reasons, the lack of forensic analysis is not fatal to NCUA's complaint,[20] and the securities claims are deemed adequately pled.


CONCLUSION

       The November 13, 2013 motion to dismiss is granted as to the Securities Act claims only.


SO ORDERED:

Dated:     New York, New York
           January 22, 2014


                                _____
                                       DENISE COTE
                           United States District Judge

---

[20] Morgan Stanley asserts, without citation, that "in other cases" NCUA has provided some form of forensic analysis.  That NCUA chose to buttress its pleadings above the standard required by Rule 8(a), Fed.R.Civ.P., before other courts does not mean that such analysis is required.