# KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209

————

(202) 326-7900
FACSIMILE:
(202) 326-7999

May 2, 2014

*Via ECF*

The Honorable Denise L. Cote
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

The Honorable John W. Lungstrum
The Honorable James P. O'Hara
United States District Court for the District of Kansas
500 State Avenue, Suite 517
Kansas City, KS 66101

The Honorable George H. Wu
United States District Court for the Central District of California
312 North Spring Street
Los Angeles, CA 90012-4701

Re:    *NCUA v. Morgan Stanley & Co.*, No. 13-6705 (S.D.N.Y.) and related actions

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 2

Dear Judges Cote, Lungstrum, O'Hara, and Wu:

Pursuant to the Court's direction (ECF No. 115),[1] National Credit Union Administration Board, as liquidating agent for four failed credit unions ("NCUA"), respectfully submits this report on the status of the parties' discussions regarding an initial discovery search protocol for these cases. NCUA also filed a report on these issues on April 18, 2014, ECF No. 108 (Ex. A), and does not restate all of those details here.  This report focuses on the disagreements that remain.  Part I discusses the impasses that remain as to Defendants' discoverable information.  Part II discusses the impasses that remain as to Plaintiff's discoverable information.  In sum, NCUA believes that the parties are at an impasse regarding discovery from Defendants on the following issues:

- **Search terms:**  All Defendants

- **Custodians:**  (1) Goldman, (2) Morgan Stanley, (3) RBS, (4) Wachovia

- **Date ranges:**  (1) Barclays, (2) RBS

- **Repositories:**  (1) Credit Suisse

In addition, as set forth below, counsel for Defendant NovaStar has informed NCUA that it has been unable to reach its client to discuss the relevant discovery issues.

## I.      Defendants' Discoverable Information

### A.      Area of Disagreement with All Defendants:  Search Terms

1.      In January and February 2014, NCUA made an initial proposal for the search terms to be used by all parties to identify responsive electronically-stored information ("ESI") in these cases.  In response to various concerns raised by certain Defendants, NCUA substantially narrowed these search terms, and submitted a revised proposal to Defendants on March 21.  The March 21 proposal provided that NCUA would agree to run the same set of search terms through the credit unions' documents as Defendants ran through their documents (even though the scope of discovery is much narrower as to the purchasers of the securities under the strict liability legal claims brought in these actions).  NCUA further agreed to discuss proposals to conduct additional searches using reasonable plaintiff-specific terms requested by Defendants.

On April 16, 2014, two days before the April 18, 2014 deadline to report to the Court, Defendants submitted a counter-proposal.  That counter-proposal significantly limited the reciprocal search terms that NCUA had proposed, and introduced arbitrary "proximity limiters" – requirements that terms appear within a certain number of words to other terms (e.g., "countrywide w/10 fraud" instead of "countrywide & fraud").  See Ex. B at 3-4.  At the same time, Defendants greatly expanded the list of terms it wanted NCUA to run through the credit union documents, including terms that Defendants themselves refused to run.  In other words, Defendants sought to greatly reduce the discovery they would produce, and massively increase the discovery that NCUA would produce.

---

[1]      Unless otherwise noted, ECF references are to *NCUA v. Morgan Stanley & Co.*, No. 13-6705 (S.D.N.Y.).

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 3

NCUA advised Defendants that it could not agree to modify the reciprocal search terms unless Defendants made a showing of undue burden to justify its proposed modifications. It was undisputed that NCUA's proposal would uncover relevant documents. Hence, before removing or limiting relevant searches to exclude relevant materials, NCUA requested some showing that the modifications were in fact necessary. *See* Ex. C at 2.

After the Court ordered the parties to meet and confer further, Defendants again waited until the eleventh hour before making any effort to substantiate their claims of burden as to NCUA's proposed search terms. Two days before the deadline, Goldman orally provided certain search term metrics. One day before the deadline, UBS and Morgan Stanley provided other metrics in an email. *See* Ex. D. Hence, most Defendants failed to provide any metrics at all. And most of those that were provided do not show that NCUA's proposed search terms are objectionable.

UBS and Goldman provided the number of documents returned per search string; when all of these are added together, they yield approximately 7.3 million hits for UBS and 4.8 million hits for Goldman. Those metrics fail to demonstrate any undue burden for three reasons. *First*, UBS and Goldman have admitted that they did not de-duplicate hits across the various search strings, and further, could not even say whether they had de-duplicated across custodians. In other words, they are counting the same document multiple times across different searches, and likely, across different custodians. Hence, a single document might generate hits from 10 different searches from 20 different custodians, yielding 200 "hits," when, in reality, that document would be produced only once. Thus, the number of *unique* documents is far fewer than the numbers thrown out by UBS and Goldman. *Second*, even these highly inflated numbers are not facially unreasonable. By way of comparison, Merrill Lynch *produced* 4 million documents in the FHFA litigation. *See FHFA v. RBS*, No. 11-1383, ECF No. 206-1 at 4 n.4 (D. Conn. Oct. 4, 2013). Thus, NCUA's proposals likely require Defendants to *review* fewer documents than were actually *produced* by similarly-situated Defendants. *Third*, the metrics provided by UBS and Goldman do not allow for any meaningful discussion of which search terms should be modified or eliminated. Because they have provided the documents hit per search string, it is impossible to determine which terms within those strings should be changed to eliminate any supposed burden.[2]

On the other hand, Morgan Stanley did provide certain metrics for specific terms that it believed were generating excessive hits. In response to those specific metrics, NCUA agreed to incorporate proximity limiters to reduce the number of hits. By contrast, there is no reason to make such modifications for terms where, after months of discussions, Defendants have failed to substantiate their claims of burden.[3] In the interest of compromise, however, NCUA has agreed to

---

[2]   At 2:44 p.m. on the day of this filing, RBS informed NCUA that its proposed terms generated 3.1 million unique hits. It is hard to evaluate this bald assertion because RBS did not provide metrics for specific search strings or terms. Nonetheless, it appears to prove that NCUA's proposals are reasonable. Merrill Lynch *produced* more than 4 million documents in FHFA, and there are more certificates at issue in NCUA's cases against RBS (73) than in FHFA's case against Merrill Lynch (72).

[3]   *Jackson v. Edwards*, 2000 WL 782947, at *3 (S.D.N.Y. June 16, 2000) ("[C]onclusory assertion[s] of burdensomeness [are] entitled to no weight whatsoever."); *see Cris v. Fareri*, 2011 WL 4433961, at *1 (D. Conn. Sept. 22, 2011) (rejecting assertion of burden where party "submitted no

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 4

eliminate one particular term that UBS claims generated excessive hits ("issue!"), and NCUA has also significantly limited the scope of the proposed searches for "shelf names."[4]

        **2.**     Because there is no dispute that the reciprocal search terms NCUA has proposed will capture relevant and responsive documents, and because Defendants have not shown any undue burden from them after lengthy review, this Court should adopt NCUA's proposal. *See* Ex. E (comparison of the parties' proposals). As discussed above, NCUA has significantly modified these search terms, and eliminated some altogether, where Defendants have shown that they are burdensome. NCUA's proposal is more reasonable than Defendants' on each of the key disputes (Exhibit E contains the numbered search strings):

- **Originators (Defined Terms #1)** – Defendants seek to search only the names of originators that contributed more than 10% of the loans for an RMBS. NCUA would prefer to search the names of all originators, but offered to compromise with a 5% cutoff. This information is plainly relevant. The material misstatements at issue in these cases assured the quality of *all* loans in the RMBS, not just those from originators who originated 10% or more of those loans.[5] Defendants have made no showing of unreasonable burden from NCUA's 5% proposal. For example, Nomura issued RMBS involving loans from numerous originators, but only two contributed 10% or more. Using the 5% threshold would add just three more originators to be searched. Moreover, at least one Defendant in the *FHFA* litigation agreed to the 5% cutoff that NCUA proposes. *See FHFA v. RBS*, No. 11-1383, ECF No. 207-15 at 3 (D. Conn. Oct. 5, 2013).

- **Shelf name searches (Defined Terms #4; Reciprocal Search String #2, 3, 4, 5, 6, 7, 8, 10, 13)** – NCUA proposes to use shelf names as an additional term in many search strings. Such a search will find documents containing either the originators *or* the shelf names at issue *and* the other terms for that specific string. For example, RBS would add additional terms like "HarborView" and "HVMLT" to certain terms already being searched. Defendants' refusal to add such terms will exclude centrally relevant documents because the shelf names are a common way to refer to the RMBS at issue. Indeed, Defendants have recognized that shelf names are significant: they requested that NCUA – and only NCUA – run a far broader search that would return *all* documents that hit on any shelf name. *See* Ex. B at 5 (string beginning with "BCAP"). NCUA's proposed use of shelf names by all parties in connection with certain other search terms is thus appropriate.

- **Loan numbers (Defined Terms #7)** – The parties agree to search for the loan numbers of the loans in NCUA's statistical samples. However, Defendants refuse to search loan numbers for loans outside the samples, even though that excludes discovery on most of the

---

[4]    affidavits or other evidentiary material describing the time, resources or costs that would be incurred in order to comply").

[4]    Shelf names are used to refer to a series of related RMBS offerings. For example, the HarborView Mortgage Loan Trust ("HVMLT") 2006-10 and HVMLT 2007-1 offerings in the *RBS* New York action are both part of the "HarborView" or "HVMLT" shelf.

[5]    Morgan Stanley has argued that SEC Regulation AB requires that RMBS offering documents need only disclose originators of 10% or more of the loans backing a securitization. But that is beside the point since the materially false statements at issue apply to *all* loans that were securitized.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 5

loans in the RMBS at issue in these cases. The scope of relevant discovery in this litigation is far broader than the sampled loans that NCUA will seek to re-underwrite. For example, any documents or communications related to loans that Defendants knew to be fraudulent or defective are plainly relevant, regardless of whether those loans are identified in the samples. Notably, Defendants have refused to limit their own discovery efforts in any way to the loans in NCUA's samples. It is thus untenable for them to refuse to produce such documents in discovery to NCUA.

- **Proximity limiters for the "Originator/Shelf Name" strings (Reciprocal Search String #2, 3, 4, 5, 6, 7, 8, 10, 13, 14, 15, 16)** – Many search terms require a document to contain both the name of a relevant originator (or shelf name) and another relevant term (*e.g.*, fraud). Defendants seek to further require that these terms be located near each other (*e.g.*, "countrywide w/10 fraud" instead of "countrywide & fraud"). This will undoubtedly exclude relevant materials without any good reason for doing so. Where Defendants have provided metrics purporting to show undue burden, NCUA has either implemented proximity limiters or removed certain terms altogether. But Defendants have not even attempted to justify their blanket approach of using proximity limiters for *all* terms. To the contrary, Defendants agreed in the FHFA litigation to run many similar terms without proximity limiters, and make no showing why that approach was acceptable there but unduly burdensome here. *See FHFA v. RBS*, No. 11-1383, ECF No. 207-15 at 7-9 (HSBC agreeing, for example, to "fraud" with no proximity limiter); *id.* ECF No. 207-19 at 4-6 (RBS offering to use many search terms with no proximity limiters).[6]

- **Warehouse terms (Reciprocal Search String #3)** – NCUA has proposed using "warehouse" terms in one search. Defendants often loaned money to originators for the purpose of making mortgage loans (known as "warehouse lines"). This practice exposed Defendants to the risk that borrowers would default, causing the originator to default on the warehouse line. Accordingly, Defendants had a strong incentive to ensure the loans were securitized – regardless of whether the loan complied with underwriting guidelines. As the head of a leading third-party due diligence firm explained (as detailed in the complaints): "I think our data would show that, you know, we saw bigger exceptions [to underwriting guidelines] to any client that had warehouse lines," because "if Bob was originating for me as the client and I had a warehouse line to you, I think what happened is a conflict of interest. That if I put back loans to you, Bob and you don't have the financial capability to honor those, then I'm kind of caught; right? [...] I'm going to take a loss on the warehouse line." ECF No. 1-1, ¶ 304.

B.     Areas of Disagreement with Specific Defendants

     1.     Barclays

**Date ranges:** Barclays refuses to begin searching its documents "two months before the first relevant whole loan purchase transaction," as proposed by NCUA. In this case, that date would be December 22, 2005. Rather, Barclays proposes to begin searching its documents "two weeks before the whole loan bid solicitation for the earliest complete whole loan pool relevant to this

---

[6]     Notably, Defendants insist that NCUA unilaterally run broad search terms without proximity limiters. *See infra* pp. 15-17; Ex. E at 8 (Plaintiff-Specific Search String #15, 16, 17, 18).

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 6

Action." We understand that date to be February 1, 2006. Other Defendants have agreed to NCUA's proposal because there are likely to be relevant documents months, not just weeks, before the relevant loan purchases. Specifically, documents concerning the lending practices of the originators at issue during the months preceding the whole loan purchases will be relevant to whether a Defendant's diligence on those loans was reasonable; for instance, if an originator was known or suspected of having poor lending practices, a higher level of diligence would be required. Barclays does not explain why it should be treated differently from other Defendants in this regard. Accordingly, NCUA respectfully requests that the Court order Barclays to begin its search two months before the relevant whole loan purchase.

### 2.   Credit Suisse

**Repositories:** Credit Suisse refuses to search specific databases containing relevant information tracking the "life of the loan," as described in detail in NCUA's April 18, 2014 submission (Ex. A at 7). These databases include due diligence material, quality control and put-back data, and underwriting exceptions, all of which are indisputably relevant to the allegations and defenses in this case. Although NCUA requested that Credit Suisse search the specific databases it believes contain this relevant information months ago – the "RPM" (residential pipeline management), "PBS" (put-back system), "Loan Approve," "CWS" (consolidated website, a database for flow channel diligence), and "WHS" (wholesale system, another database for flow channel diligence) databases – Credit Suisse failed to even discuss most of these repositories in its April 18 report. Rather, it addressed only one, the Loan Approve database. Credit Suisse's silence as to the relevance of the other databases, and any burden of searching them, speaks volumes, especially since Credit Suisse has searched these databases before in other RMBS litigation. Moreover, other Defendants have agreed to search equivalent databases.

These databases are where Credit Suisse maintains critical information about the securitizations, including the diligence and monitoring that Credit Suisse conducts on the loans underlying those deals. Credit Suisse's claim that information in the Loan Approve database would be entirely duplicative of information contained in other documents in its production is wholly unsubstantiated. The fact that these separate databases exist show that they are not entirely duplicated elsewhere. Moreover, this claim is belied by the fact that Credit Suisse has been willing to search this database in multiple other cases,[7] and it would have had no reason to do so if the databases truly were redundant. In all events, even if the databases were partially duplicative of other documents, they still should be produced because, unlike other documents scattered throughout Credit Suisse's production, the databases house a complete set of relevant information in one organized location.

NCUA's attempts to further negotiate this issue have failed. Credit Suisse has declined to re-consider its position. Credit Suisse has provided no additional explanation as to why it was willing and able to search these databases in other actions. Nor has it provided any concrete cost estimates beyond its vague speculation that production could cost "tens of thousands" or "hundreds of thousands" of dollars, nor explained why Credit Suisse is not similarly situated to the other

---

[7]   *See NCUA v. Credit Suisse*, No. 13-6705, ECF No. 85 at 2 (S.D.N.Y. Apr. 18, 2014) ("Queries used in previous litigations could not be reused; the searches would have to be regenerated with respect to the securitizations and loans at issue here.").

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 7

defendants that have agreed to search similar databases. Accordingly, NCUA respectfully requests that the Court order Credit Suisse to search for and produce information from all of the databases described above.

### 3.   Goldman

**Custodians:** Goldman has resisted NCUA's continued efforts to identify a reasonable list of custodians. Goldman has proposed 31 custodians – 14 for the New York action and 23 for the California action (six of these custodians overlap between the actions). That list excluded dozens of individuals that were listed on Goldman's initial disclosures as "likely [to] have discoverable information," that were listed on Goldman's working group lists for the relevant transactions, and/or that appeared likely to have discoverable information from documents released by the Senate in connection with its investigation of Goldman's conduct during the financial crisis.

Given the apparent deficiencies in Goldman's custodian list, NCUA requested certain information that it requested from all Defendants, and that Goldman could have easily provided: (1) a list of individuals Goldman has used as custodians in other RMBS litigation, (2) a list of relevant senior executives and the members of relevant committees; and (3) a list of individuals who served in eight relevant roles identified by NCUA, *see* Ex. A at 2. This was the exact information the Court expected the parties to exchange. *See* Nov. 14, 2013 Hearing Tr. 26:13-29:21 (discussing the sharing of information sufficient "to figure out which of the defendants' employees touched the deals in question, structured securitizations, what their due diligence teams were, et cetera"). Without any explanation or showing of burden, Goldman has refused to provide that information. Goldman refused to provide any explanation for the exclusion of dozens of individuals until two days before this report was due; and even then, Goldman refused to provide its explanations in writing to provide an undisputed record of its representations. Moreover, although NCUA has requested for months that Goldman identify the individuals that were designated as custodians in other RMBS litigation, Goldman refused to provide that information – until 5:00 p.m. on the date this submission was due, when Goldman disclosed the custodians it designated in the *FHFA* case. A cursory review of Goldman's last minute disclosure shows that at least six individuals whom NCUA has requested that Goldman add as custodians for months have, in fact, been custodians in other RMBS cases. Hence, Goldman has already collected and searched the documents for each of these individuals in related litigations. Still, Goldman refuses to add these individuals as custodians in these actions.

For instance, Dan Sparks was the head of Goldman's Mortgages Department and CEO, Vice President, and a Director of Defendant GS Mortgage Securities Corp., and supervised all aspects of the due diligence and securitization process. The Senate has released an email in which Mr. Sparks writes to other senior Goldman executives (including the CFO) about the "horrible" performance of certain Goldman RMBS, including suspected "fraud at origination" for certain originators at issue in this litigation (Washington Mutual/Long Beach). *See* Ex. F. Yet, Goldman has represented that Mr. Sparks had no involvement with the RMBS at issue, and thus, would have no discoverable information. That does not follow; even if he was not involved with a particular RMBS, Mr. Sparks supervised the entire securitization process and his knowledge of fraud by certain originators that contributed loans to numerous RMBS would be relevant and discoverable.

Another example is Bill Shuey. According to Goldman's organizational charts, he was a manager in Goldman's Due Diligence department and supervised loan-level reviews and valuations.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 8

The Senate released an email in which Mr. Shuey is apprised of fraud findings for 72 of 125 loans that Goldman purchased from another originator at issue in this litigation (Countrywide). *See id.* NCUA further understands from a recent filing in the *FHFA* litigation that Mr. Shuey's supervision of due diligence processes made him sufficiently relevant to be deposed in that litigation. But here, Goldman represented that Mr. Shuey will not have discoverable information because he was not involved with the RMBS at issue – apparently taking the view that supervising due diligence is insufficient involvement.

Only a few hours before this filing did Goldman finally disclose that both Messrs. Sparks and Shuey have been custodians in other RMBS cases. The implausibility of Goldman's explanations, and Goldman's persistent refusal to provide relevant information during the meet-and-confer-process, highlights the need for this Court's intervention. NCUA requests that this Court order Goldman to designate the following individuals, who are custodians in the *FHFA* case, as custodians here: Chris Gething, Deana Knox, Loren Morris, Kelli Murray, Bill Shuey, and Dan Sparks. NCUA has requested for months that these individuals be added as custodians, and Goldman has offered no legitimate basis why their documents are not equally relevant here.[8]

NCUA further requests that the Court order Goldman to provide: (1) the custodians used in *all* other RMBS litigation and investigations; (2) a list of senior executives and membership for any relevant committees; and (3) a list of all individuals serving in the eight relevant functions. This information is necessary for NCUA to identify additional appropriate custodians, given Goldman's failure to identify appropriate custodians itself. After providing this information, Goldman further should be ordered to meet-and-confer in good faith regarding the addition of other appropriate custodians.

**Search Terms:** Also on 5:00 p.m. on May 2, 2014, Goldman stated for the first time that it would use different search terms for custodians designated in the California case than it would use for custodians designated in the New York case. This is flatly contrary to Goldman's prior representations on the parties' meet-and-confer conferences. Under Goldman's proposal, for instance, certain search terms would be run through California custodians, but not through New York custodians. Goldman offers no good reason for this different approach. It is undisputed that if a Goldman employee has documents showing that a particular originator who issued loans that were securitized into the RMBS at issue was disregarding its underwriting guidelines or issuing problematic loans, such documents would be centrally relevant regardless of whose files those documents come from. For this reason, other Defendants have agreed to run the same search terms across all custodians in all actions. A different rule should not apply to Goldman, nor should Goldman be permitted to renege on its promises at the last minute.

### 4. Morgan Stanley

**Custodians:** Morgan Stanley listed 117 Morgan Stanley individuals on its Initial Disclosures. After initially designating only 15 of those individuals as custodians, Morgan Stanley has now agreed to designate a total of 39 custodians in the New York and Kansas actions. NCUA believes that the dozens of other individuals on the Initial Disclosures have discoverable

---

[8]   NCUA will meet-and-confer with Goldman regarding other custodians in the *FHFA* litigation, some of whom were disclosed to NCUA for the first time during the evening of this filing.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 9

information and should presumptively be designated as custodians. *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013) ("The presence of these proposed custodians on the working group lists is sufficient to establish that their inclusion in ESI searches is reasonably calculated to lead to relevant evidence that might not be captured if they were excluded."); *In re Morgan Stanley Pass-Through Certificates Litig.*, 2013 WL 4838796, at *1-2 (Sept. 11, 2013 S.D.N.Y.) (each employee on the initial disclosures and working group lists was designated as a custodian). As is the case with certain other Defendants, Morgan Stanley has refused to provide basic information about potential custodians, including a list of individuals Morgan Stanley has used as custodians in other RMBS litigation, and a list of individuals who served in eight relevant roles identified by NCUA, *see* Ex. A at 2. Nonetheless, NCUA does not request that the Court order Morgan Stanley to designate other individuals on its initial disclosures as custodians at the present time and will reserve its rights to request additional custodians if in the course of reviewing Morgan Stanley's production, it is apparent that additional custodians should be designated.

The parties are at an impasse, however, regarding Morgan Stanley's failure to designate senior executives and members of relevant committees, including the firm risk and credit committee. Indeed, Morgan Stanley has refused to even disclose the names of senior executives with relevant knowledge or the identity of members of these relevant committees. Nor has Morgan Stanley agreed to disclose the senior executives and members of relevant committees that it has designated as custodians in other related RMBS litigation. As this Court has recognized, these individuals will likely have relevant information regarding Morgan Stanley's general RMBS procedures, will have made pertinent policy decisions, and will likely have investigated the cause of the substantial impairment of Morgan Stanley's RMBS, including the RMBS at issue. *See* Oct. 15, 2012 Hearing Tr. 70:7-13, *FHFA v. UBS Americas Inc.*, No. 11-5201 ("It seems to me if executives, people with management responsibilities, people who are members of special committees and make reports for the institution with fact finding about what happened, in a way, that could be binding on the defendants at trial or certainly highly relevant to a jury's analysis of the defenses that are being put forward at trial, they have to be searched."). NCUA therefore requests that the Court order Morgan Stanley to designate as custodians the senior executives and members of the firm credit or risk committees that Morgan Stanley has designated as custodians in other RMBS litigation.

## 5. NovaStar

Counsel for Novastar has informed NCUA that it has had difficulty reaching its client to confirm the specifics necessary for the parties to finalize agreement on search terms. Nonetheless, NCUA and NovaStar do not anticipate having any discovery disputes at this point. NovaStar has confirmed that, in the absence of an agreement between the parties, it will search the documents of all individuals in its initial disclosures using NCUA's search term proposal, except to the extent the Court modifies it after this submission.

## 6. RBS

**Custodians:** The parties have agreed that RBS will designate as custodians all individuals identified in its initial disclosures and working group lists. RBS has refused to add specific senior managers and personnel from the credit and risk management groups, who generally do not appear on working group lists. RBS initially offered to use these individuals as custodians because they have relevant information, but later withdrew its offer because NCUA would not acquiesce to other demands from RBS.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 10

Most of the securities in these actions – 24 of 37 – are also at issue in the *FHFA* litigation. Accordingly, on January 14, 2014, RBS proposed to have its *FHFA* production for the overlapping deals serve as its production in this case. RBS disclosed that the *FHFA* production was collected from 72 separate custodians, and it provided the search terms and date ranges used to collect those documents. FHFA has filed motions to compel claiming that those productions were inadequate.

On March 26, 2014, RBS agreed to negotiate new search terms and date ranges with NCUA, but significantly narrowed the list of custodians. In a meet-and-confer on March 27, and again in correspondence on April 8, NCUA asked for an explanation for the reduction and asked that at least 17 individuals, who were custodians in FHFA, be added as custodians here. After RBS refused on April 11 to add the requested custodians, NCUA provided additional information on April 14 explaining again why those individuals are appropriate custodians here. During a meet-and-confer on April 15, RBS informed NCUA for the first time that its client contact was on vacation and that RBS would be unable to conduct any further negotiations until the week following the day this submission was originally due.[9]

RBS notified NCUA on April 23 that it would designate 11 additional *FHFA* custodians as custodians here, yet it again failed to provide any explanation for its refusal to designate the others. Instead, RBS simply stated that it "does not believe that the remaining individuals . . . are appropriate or necessary custodians." After NCUA pointed out the insufficiency of this response, RBS claimed on May 1 that the others "appear to have had no involvement with the deals at issue here." RBS further stated that they would be willing to meet and confer "later" after a "review of the documents." But the documents already produced by RBS, as well as other publicly available documents, reveal that the following individuals were designated as custodians in *FHFA*, and are appropriate custodians here, because they had relevant overarching duties and/or managerial responsibilities:

The following individuals were executives with management responsibility for RBS's securitization functions or credit risk management:

- William Gallagher was the Chief Credit Officer from 1989-2008 and Chairman of the Credit and Commitments Committee. He is identified in presentations as part of the "supporting infrastructure" for RBS's Whole Loan Acquisition Business.

- Paul Goudie was the former Managing Director/Senior Credit Officer in the Credit/Risk Department, and is the current Chief Credit Officer. He is identified in presentations as part of the "supporting infrastructure" for RBS's Whole Loan Acquisition Business, with responsibility for overseeing the Asset-Backed Finance business.

- John C. Anderson was Managing Director and Co-Head of Asset-Backed Finance. He is identified in presentations as part of the "supporting infrastructure" for RBS's Whole Loan Acquisition Business during the relevant time period. He also signed the registration statements for securitizations at issue, and is individually named as a defendant in other RMBS litigation against RBS.

---

[9]   Despite its stated inability to negotiate discovery as ordered by the Court for months, RBS's counsel found sufficient time to prepare and file two emergency motions in the California and Kansas (but not New York) actions, seeking to reconsider the Master Discovery Protocol.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 11

- James Esposito was an Associate General Counsel who is identified in presentations as part of the "supporting infrastructure" for RBS's Whole Loan Acquisition Business with responsibility for managing the legal and compliance department's coverage of the ABS, MBS and Principal Finance groups.   He also signed the registration statements for securitizations at issue, and is individually named as a defendant in other RMBS litigation against RBS.

- Carol P. Mathis was the Managing Director and Chief Financial Officer of Capital Markets. She also signed the registration statements for securitizations at issue, and is individually named as a defendant in other RMBS litigation against RBS.

- Robert J. McGinnis was the Managing Director and head of Asset-Backed Finance.  He also signed the registration statements for securitizations at issue, and is individually named as a defendant in other RMBS litigation against RBS.

- George Davala was the Managing Director and Head of Mortgage and Asset-Backed Sales from 1990-2008. He also is identified in presentations as part of the "supporting infrastructure" for RBS's Whole Loan Acquisition Business.

The two following individuals were responsible for RBS's strategy regarding mortgage-backed securities:

- Alexander Crawford was Managing Director responsible for MBS Strategy from 2004-2007. He also is the author of relevant publications for investors such as "2007 MBS Outlook" (Jan. 2007) and "A Macro Look at Subprime Losses, ARMs and Convexity Hedging" (Nov. 2007).

- Pankaj Jha was Senior Vice President responsible for MBS Strategy. He also is author of relevant publications for investors such as "Agency/Non-agency CMOs: Year in Review and Outlook for 2007."

Several others appear to have had relevant responsibilities in asset-backed trading, sales, and credit risk management:

- Jeffery DiModica is identified in organizational charts and Whole Loan presentations as Managing Director in Asset-Backed Sales.

- Steve Parrett is identified in organizational charts as a member of the Credit/Risk Department.

- Anne Marie Petrovcik is identified in organizational charts as a Managing Director in the Credit/Risk Department.

- Paul Spiridigliozzi is identified in organizational charts as Director in the Credit/Risk Department.

- Ken Zegar was Managing Director in Asset-Backed Trading from 2005-2008.

    The parties are at an impasse on this issue. These *FHFA* custodians are appropriate custodians here because RBS has failed to affirm that their roles were strictly limited to a specific deal not at issue here.  Indeed, the descriptions above show that their roles were far more

encompassing and critical.  Accordingly, NCUA requests that the Court order RBS to designate these individuals as custodians.

**Search terms and date ranges:**  The majority of other Defendants have agreed to apply a uniform date range for all custodians, and to run all search terms across all custodians.  RBS has largely rejected this approach.  Although there are 70 certificates and 37 deals at issue, RBS proposes that only 18 custodians should have all search terms run across their ESI, with the rest of the custodians' documents searched using only very limited search terms.  For example, RBS designates the bulk of its custodians for only one or two of the actions, and further limits those custodians to only 4 search terms: Deal Names, CUSIPs, Loan Numbers, and Credit Union names.

RBS further insists on a "bubble" approach of two or three months before and two months after the relevant whole-loan purchase or securitization closing date for the "Originator/Shelf Name" terms, which are the majority of NCUA's proposed search terms.  And as noted above, RBS says it will only run these "Originator/Shelf Name" terms across the documents of a small number of custodians.  As a result, under RBS's proposal, the bulk of the search terms will only be run over a four-to-five-month period for less than two dozen custodians.

For the rest of the search terms, RBS has agreed to an end date of December 31, 2008.  NCUA proposes an end date of December 31, 2009 unless RBS is able to show, on a case-by-case basis, that particular custodians had no relevant responsibilities past the date of the securitizations.  This is the same end date that other Defendants have agreed upon.  While RBS has generally agreed to the start date concept proposed by NCUA, its implementation is thwarted by RBS's insistence on using different start dates for each deal.

The parties are at an impasse on these issues.  The "bubble" approach for RBS's documents searches is inappropriate – an approach that other Defendants have rejected and described as a "headache."  RBS shows no undue burden from following the approach proposed by NCUA, and accepted by the majority of Defendants.  RBS's refusal is particularly inappropriate given the large number of deals at issue, the large number of overlapping custodians, and RBS's representation that it ran all search terms across the documents of all custodians used in *FHFA*.  Accordingly, NCUA requests that the Court order RBS to run all search terms across the documents of all custodians and adopt NCUA's general proposal regarding start and end date ranges.

### 7.   Wachovia

**Custodians:**  The parties have agreed that Wachovia will designate as custodians the eight individuals identified in its initial disclosures and eleven additional Wachovia employees identified on the working group lists for the securitizations at issue.  However, the parties remain at an impasse with respect to whether additional Wachovia employees should be designated as custodians.  In its April 18 report, Wachovia stated that "the Parties would benefit from additional time to meet and confer on" this issue.  But Wachovia did not follow through.  When NCUA contacted Wachovia to discuss this issue further, Wachovia stated that its "position on custodians has not changed" and offered no proposal for compromise.

Wachovia's refusal to add custodians is untenable.  All but one of the employees listed below were identified on Wachovia's working group lists, and hence, a presumptive custodian.  *See supra* p. 9.  NCUA has not demanded that every Wachovia employee on working group lists be designated

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 13

as custodians, but Wachovia has identified no sound basis for excluding the following twelve employees:[10]

- Randy Robertson is the first name on the working group list of each securitization as the Managing Director of the Residential Mortgage Group.  The organizational chart produced by Wachovia also shows him as the head of the Group, with oversight responsibility for all relevant functions.  According to counsel's research, his responsibilities covered asset securitization origination activities, whole loan trading, warehouse lending, principal finance, and risk management.  He was also a member of the Board of Directors for Wachovia Mortgage Loan Trust, LLC.

- Don Truslow was the Chief Risk Officer for Wachovia between 2000 and 2008. As Judge Cote noted in the *FHFA* litigation, executives with management responsibility – such as the chief risk officer – have to be searched.  *See* supra p. 9.  As the Chief Risk Officer, Mr. Truslow would have relevant documents relating to the risk RMBS—including Wachovia's due diligence, which it used on the securitizations at issue—posed to the company.

In addition to appearing on the working group lists, each of the following employees was responsible for due diligence at Wachovia and worked on one or more of the securitizations at issue. Due diligence performed on the whole loans collateralizing the securitizations is of central importance in this case, particularly because Wachovia has raised its due diligence as a defense:

- Rob Ashbaugh is on the working group lists for the WMLT 2006-ALT1 and WMLT 2006-AMN1 securitizations as the Vice President of Investor Reporting who received all deal documents.  According to his own description of his role on LinkedIn, he managed a large trading portfolio of mortgage products and was responsible for transaction management, servicer oversight, management/risk reporting, credit review and analysis, corporate counterparty risk analysis and due diligence, secondary marketing, loss mitigation, short sale, and REO asset strategy.

- Michael Schwartz is on the working group lists for the WMLT 2006-ALT1 and WMLT 2006-AMN1 securitizations as the Vice President responsible for Contract Finance Due Diligence who received all deal documents. According to information from Wachovia, he was responsible for negotiating whole loan sales contracts.  According to his own description of his role on LinkedIn, he also created and led the Due Diligence audit function with the Asset Securitization Division.

- Phil Cary is on the working group lists for the WMLT 2006-ALT1 and WMLT 2006-AMN1 securitizations as the Vice President responsible for Collateral Files Due Diligence who received all deal documents.

---

[10]   Wachovia has claimed that the "relatively small scope and size of NCUA's claims" does not justify the number of custodians NCUA has requested.  NCUA's claims involve $225 million of RMBS purchases, and Wachovia cites no authority stating that relevant custodians should be eliminated in a lawsuit of this size.  Further, Wachovia has not substantiated its burden argument.  It merely notes that it has collected 3.8 million emails for the 19 agreed-upon custodians, but it does not state how many unique documents would be subject to the parties' search protocol.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 14

- Richard Watson is on the working group list for the WMLT 2006-ALT1 securitization as an Associate in Collateral Risk Underwriting/Due Diligence who received all deal documents.

In addition to appearing on the working group lists, the following two employees were in the whole loan trading group. Whole loan trading is a critical aspect of this case because the misrepresentations alleged by NCUA relate to the loans purchased by, among others, these employees:

- Ibo Incoglu is on the working group list of each securitization as a Vice President in ABS Trading. Wachovia also identified him as a person involved with the WMLT 2006-AMN1 transaction in the Free Writing Prospectus.

- Sharvin Setoodeh is on the working group list of each securitization as a Vice President in Whole Loan Trading and received all deal documents. Wachovia also identified him as a person involved with the WMLT 2006-AMN1 transaction in the Free Writing Prospectus.

In addition to appearing on the working group lists, the following three employees were identified as performing relevant functions:

- Scott Schuman is listed as a Vice President in the Residential Mortgage Group on the WMLT 2006-AMN1 working group list and received all deal documents. Wachovia also identified him as a person involved with the WMLT 2006-AMN1 transaction in the Free Writing Prospectus.

- Florian Halili is on the working group lists for the WMLT 2006-AMN1 and NHEL 2006-5 transactions as an analyst in Structuring, and he received all deal documents. Wachovia also identified him as a person involved with the WMLT 2006-AMN1 transaction in the Free Writing Prospectus.

- Blake O'Connor is on the working group list of each securitization as the Director or Managing Director of the Syndicate Group. Wachovia also identified him as a person involved with the WMLT 2006-AMN1 transaction in the Free Writing Prospectus.

Finally, Zach Bolster is the only Residential Mortgage Group analyst identified on the NHEL 2006-5 working group list and he received all deal documents. Wachovia designated an analyst for each of the other deals. Mr. Bolster should likewise be designated as a custodian to ensure that all relevant documents are produced relating to the NHEL 2006-5 securitization.

## II.    Plaintiff's Discoverable Information

### A.    The Liquidated Credit Unions

**Custodians:** Defendants asserted in their April 18th submission that "NCUA has provided little or no explanation of its failure to designate" individuals in certain credit union departments. *See* ECF No. 109 at 3 n.4. NCUA was surprised by that assertion, which was inaccurate. In fact, NCUA had provided this information upon request prior to April 18, even though many Defendants refused to provide similar information. On April 24, NCUA again offered to provide this information to any Defendant and to respond to additional reasonable inquiries about credit union custodians. Upon receiving no further response, NCUA sent a letter to Defendants on April 29 containing such information to ensure that all Defendants were fully aware of NCUA's reasons

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 15

for not designating certain custodians.  *See* Ex. G.  NCUA understands that Defendants do not currently object to the initial list of credit union custodians.

**Search terms:**  On December 20, 2013 for most Defendants, and February 19, 2014 for Goldman, NCUA proposed a list of search terms that NCUA would use to search the credit unions' documents, expecting that Defendants would use a similarly broad list to search their own documents.  Those discussions led to a narrower set of joint search terms that NCUA proposed on March 21, 2014.  NCUA requested that Defendants use these search terms for their documents, and that NCUA likewise would run those terms across the credit unions' documents.  NCUA further agreed to run additional, reasonable plaintiff-specific search terms.

Two days before the last deadline, Defendants requested that NCUA – and only NCUA – use 24 additional plaintiff-specific search strings.  *See* Ex. B at 6-8.  These searches were far broader than the reciprocal searches that NCUA had proposed.  Several of Defendants' "plaintiff-specific" search requests were materially identical to searches that Defendants themselves had refused to run. Defendants made these requests despite the fact that the scope of Defendants' discovery on the credit unions is far narrower than the scope of NCUA's discovery on Defendants.  As a matter of law, documents relevant to Defendants' actual knowledge and statute of limitations defenses must be tethered to the specific securities at issue.[11]  By contrast, NCUA is entitled to broader discovery of Defendants' general RMBS practices.  For instance, Defendants have asserted a due diligence defense, which requires each Defendant to prove that it had, "after reasonable investigation, reasonable ground to believe and did believe" that the statements in the offering documents were true.  15 U.S.C. § 77k(b)(3)(A).  Documents relating to Defendants' general RMBS practices – in addition to documents relating to the specific RMBS at issue – are relevant to this defense.

In an effort to compromise, NCUA has agreed to run in substantial part 9 of the 18 broad plaintiff-specific search strings currently requested by Defendants – even though they are not tethered to the specific securities at issue and therefore are designed to pull documents well beyond the scope of permissible discovery.  *See* Ex. E at 6-8.[12]  However, NCUA does not agree to unilaterally run the remaining 9 searches across its own production (but not Defendants' productions).[13]  As set forth below, many of the requested plaintiff-search terms are far broader than searches that Defendants would agree to use (*e.g.*, they are not connected to the RMBS or originators at issue in these actions).  Given the elements of the applicable legal claims in these actions, it is hard to see why NCUA should be required to implement broader searches than Defendants, let alone

---

[11]  *See FHFA v. UBS Americas, Inc.*, 2013 WL 3284118, at \*14-20 (S.D.N.Y. June 28, 2013) (actual knowledge defense); *id.* at \*20-21 (statute of limitations defense); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (statute of limitations defense).

[12]  NCUA does so without prejudice to its right to reject overbroad terms in the future.

[13]  At 7:34 p.m. on the night of this submission, Defendants sent NCUA a new plaintiff-specific search proposal, which slightly modifies its April 18 proposal.  Given the late hour at which Defendants submitted this new proposal – only hours before this submission is due – NCUA cannot respond substantively to each of the revised search strings other than to note that these revisions do not adequately address the concerns raised below.  NCUA further respectfully submits that these eleventh hour proposals by Defendants are unproductive.  This Court has already granted Defendants requests for two additional weeks to meet and confer on these issues, and there is no reason to submit proposals on the evening these submissions are due.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 16

searches similar to those Defendants have flatly rejected.  In any event, each of Defendants' one-sided search term requests is flawed (Exhibit E contains the numbered search strings):[14]

- **Plaintiff Specific Search String #1** – Terms such as "mortgage" or "loan" are facially overbroad and overly generic in this context, hitting on irrelevant documents that merely mention the Defendants' names along with "mortgage" and "loan."  Similarly, terms such as "prospectus," "term sheet," or "trade ticket" are not only generic, but also will simply identify documents that Defendants provided to the credit unions.  There is no reason for NCUA to reproduce those documents to Defendants.

- **Plaintiff Specific Search String #2** – NCUA has removed "review!" and "approv!" because they are commonly used words.  If Defendants insist on these terms, then the same terms should be added to Reciprocal Search String #3, which also targets "reviews" – including "suspensions," "terminations," and "approvals" – of the counterparties at issue (originators, underwriters, issuers).  Likewise, NCUA has removed the generic terms "underwriter," "issuer," "originator," and "counterparty."  If Defendants insist on these terms, then the same terms should be added to Reciprocal Search String #3.

- **Plaintiff Specific Search String #3, 6** – This string targets documents relating to the statute of limitations.  NCUA has removed general terms such as "mortgage," "loan," and "note" because this case concerns the statute of limitations for RMBS litigation, not litigation concerning individual mortgages or loans.  Given that the credit unions were large financial institutions, the addition of the "mortgage," "loan," and "note" terms runs the risk of producing irrelevant – and sensitive – information regarding litigation having nothing to do with RMBS.  In contrast, Defendants have insisted that searches they run be connected to the RMBS or originators at issue.  "Investigat! or inquir!" are commonly used terms that are facially overbroad.

- **Plaintiff Search String #4** – This string targets general documents discussing the housing market; it is not plaintiff specific.  If Defendants insist on its usage, then it should be a reciprocal term.

- **Plaintiff Search String #5, 14, 18** – These strings appear to target general communications between the credit unions and NCUA such as any "annual report" to NCUA (#5), any "report" or "examination" exchanged to or from the NCUA (#14), or any mention of NCUA and mortgages in the same document (#18).  These are not targeted to yield discoverable information, which for purposes of Defendants' affirmative defenses, must relate to the specific securities at issue.  NCUA has already agreed to search all deal names and CUSIPs as standalone terms.  Thus, Defendants will receive communications to and from NCUA that mention the specific RMBS at issue to the extent they are not privileged.  Broader searches for all reports (as Defendants propose) will not only be irrelevant, but they will be highly burdensome because communications between NCUA and the credit unions

---

[14]   In certain circumstances, NCUA has modified the plaintiff-specific search strings to remove facial overbreadth given that Defendants' discovery requests must be targeted to the specific RMBS at issue.  Because Defendants waited until April 16 to propose its plaintiff-specific searches, NCUA has not had sufficient time to generate metrics for each specific term.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 17

must be reviewed for the bank examiner privilege. For comparison, Defendants have refused to run general terms not tied to the specific RMBS or originators at issue.

- **Plaintiff Search String #7, 8, 9, 10, 11** – NCUA modified portions of these search strings because they appeared facially overbroad. Defendants' proposals generate hits whenever the states Texas, Illinois, California, or Kansas are mentioned in the same document as "claim," "note," etc. Because the credit unions were located in those states, numerous documents contain state names in signatures and addresses, thus causing hits for many documents just because they contained the generic words "claim" and "note."[15]

- **Plaintiff Search String #12, 13, 15** – These terms appear to target specific documents. NCUA believes it would be more appropriate to discuss the production of these documents, to the extent they are relevant, in the context of specific document requests. To the extent Defendants seek communications about these documents (as they have asserted), these terms need some connection to the specific securities at issue for them to produce relevant information for Defendants' affirmative defenses. For example, Defendants seek all documents mentioning the Asset and Liability Committee at the credit unions, which had functions and roles beyond overseeing RMBS investments. NCUA has already agreed to run terms designed to capture documents regarding the specific securities at issue.

- **Plaintiff Search String #16, 17** – NCUA has already proposed reasonable terms targeting documents relating to Defendants' statute of limitations defenses (#3, 6, 7, 8, 9, 10, 11). These strings are far broader. They hit on combinations such as a Defendants' name and the general terms "class," "action," "claim." They also are not tied to the specific securities at issue, and thus, will not yield discoverable documents for the statute of limitations defense. Nor are these string necessary. Defendants already will receive any document mentioning the deal names or CUSIPs at issue, which will include any documents mentioning lawsuits in connection with those deal names (to the extent they are not privileged).

## B.    NCUA as Agency

These lawsuits involve the purchase of RMBS securities by four credit unions two to three years before NCUA first became conservator and liquidating agent for those credit unions. Therefore, NCUA has agreed to produce a large quantity of documents from all credit union employees who, based on NCUA's reasonable investigation, made purchase decisions and conducted relevant credit analysis regarding the securities at issue, as well as senior-level employees (including the chief investment officer) who made policy decisions regarding these securities.

Had the credit unions survived to bring these claims on their own, there would be no basis to seek discovery from NCUA as an agency regarding the credit unions' purchases of the RMBS Certificates or when the credit unions allegedly discovered the claims asserted in these actions, which are the focus of Defendants' requests for discovery in these cases. Discovery from NCUA as an agency is no more appropriate here simply because NCUA has brought the same lawsuits on behalf of failed credit unions that could not bring lawsuits themselves. As the Supreme Court has explained, NCUA "'steps into the shoes'" of the failed credit union and "'succeed[s] to [its] rights,

---

[15]    As noted above, Defendants proposed some limitations on these searches at 7:34 p.m., and NCUA has not had a chance to consider those changes

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 18

titles, powers, and privileges.'" *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (describing and quoting 12 U.S.C. § 1821(d)(2)(A), an identically phrased statute that applies to the Federal Deposit Insurance Corporation ("FDIC")); *see* 12 U.S.C. § 1787(b)(2)(A) (same language).

**Damages:**  In a resecuritization process known as the NCUA Guaranteed Notes ("NGN") program, NCUA participated in selling the RMBS certificates in 2010 and 2011, after the credit unions had failed.  For this litigation, that participation is the only relevant act that occurred after conservatorship of the credit unions.  The parties have agreed on an initial search protocol for NGN information that applies to NCUA and to Barclays, who was hired to assist with the NGN program.

**Other elements of the strict liability offenses:**  Many defendants have asked NCUA to designate additional NCUA employees as custodians apart from the NGN program.  NCUA has explained that NCUA employees are unlikely to have discoverable information because they were not responsible for purchasing or performing credit analyses on the RMBS at issue.  NCUA merely brought these cases on behalf of the credit unions because those credit unions failed.

In their April 18 submission, Defendants provided four reasons why NCUA's documents would be relevant to this litigation.  Each is unpersuasive.[16]  *First*, Defendants assert that it would be "highly inequitable" to prohibit discovery from "the entity suing them."  ECF No. 109 at 2.  That is a fundamental misconception.  As NCUA has repeatedly explained, these claims are brought by the credit unions, and there is no dispute that Defendants will receive broad discovery from the credit unions that are "the entit[ies] suing them."  The only role of NCUA in this litigation is to bring the claims as liquidating agent for the failed credit unions.  *O'Melveny & Myers*, 512 U.S. at 86 (in bringing suit as liquidating agent, NCUA "'steps into the shoes'" of the failed credit union).  Defendants suggest that NCUA was involved in the "review of the credit unions' RMBS holdings and evaluations of their potential claims," but make no effort to explain how these *ex-post* legal evaluations and work product could be discoverable.

*Second*, Defendants claimed that NCUA "actively monitored the credit unions," and that such regulatory oversight would be relevant to this litigation on the following issues: (1) "the quality of the mortgages underlying the RMBS at issue"; (2) the "credit unions' awareness of RMBS-related risks [and] their knowledge of potential claims"; and (3) "the cause of the [credit unions'] alleged losses."  That is legally and factually incorrect.

As for the first two issues, Defendants will receive documents from each credit union employee responsible for purchasing and performing credit analyses on the RMBS at issue, including any non-privileged communications with NCUA.  Defendants fail to explain why or how NCUA is likely to have additional discoverable information.  Indeed, it is undisputed that NCUA did not participate in the purchases of the RMBS at issue in this litigation.  Furthermore, Defendants did not (and cannot) argue that NCUA's own knowledge is relevant to this litigation.  *See NCUA v. Fisher*, 653 F. Supp. 349, 350 (E.D. Mo. 1986) (holding that NCUA's knowledge cannot be imputed to credit unions as a matter of law).  Thus, at best, Defendants hope to find internal NCUA documents (not shared with the credit unions) that discuss what the credit unions knew.  For those documents

---

[16]  Defendants made several of these arguments for the first time in their April 18th submission.  To the extent that Defendants rely on new arguments in their May 2nd submission, NCUA respectfully requests an opportunity to respond.

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 19

to be relevant to the strict liability claims asserted in these actions by the liquidated credit unions, they must both (1) reflect the credit unions' actual knowledge and (2) pertain to the RMBS specifically at issue in this case, not RMBS generally. *See supra* note 11. It would be a pure fishing expedition to search an agency's files for such documents. By Defendants' logic, the documents of one Defendant need to be searched on the off chance that they discuss what another Defendant knew or should have known.

As to the third issue (the cause of the RMBS losses), Defendants do not explain what documents NCUA might have that could be relevant.[17] Loss causation is an objective issue. This is a subject of expert testimony, and such experts almost certainly will rely on objective market information to determine the cause of the losses. Any opinion that NCUA employees may have expressed as to the cause of the losses is irrelevant. Indeed, any information that NCUA may have pertaining to the cause of the losses would be no more probative than the information possessed by innumerable sophisticated investors, advisors, and regulators. *Cf. NCUA v. Morgan Stanley & Co.*, 2014 WL 241739, at *14 n.14 (S.D.N.Y. Jan. 22, 2014) ("From the perspective of the Credit Unions, the NCUA reports regarding the mortgage industry were no different from reports authored by any other organization."). If NCUA's thoughts about loss causation are discoverable, then so too are those from numerous analysts and individuals from each Defendant regarding the failures in the RMBS market, the housing downturn, and the recession in general. Defendants would need to expand greatly their own search protocols to include their proprietary trading groups, their investment advisory groups, and their market research groups, among others – which, of course, they are not willing to do.

*Third*, Defendants claim they are entitled to communications from former credit union employees if NCUA employed or engaged them following conservatorship. Again, Defendants do not explain why such communications from dates long after the purchases of the RMBS at issue would be relevant. If they were relevant, Defendants would be required to produce all communications from their own employees for similar periods of time. But Defendants generally have refused to produce information after late 2009 (and sometimes earlier). Moreover, the parties have agreed that the relevant end date for the credit union searches is the date of conservatorship for each liquidated credit union. Defendants offer no reason why an expanded date range is somehow appropriate for NCUA, which had no role in the purchases of the securities at issue.

*Fourth*, Defendants incorrectly suggest that § 8(c) of the Master Discovery Protocol's ("MDP") supports their position. The MDP provides no guidance regarding the appropriate scope of discovery from NCUA, as this issue was not before the Court.

---

[17]   *See Cromer Fin. Ltd. v. Berger*, 2003 WL 21436164, at *7 (S.D.N.Y. June 23, 2003) (Cote, J.) ("[T]he issue of loss causation is an objective one."); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 413 (5th Cir. 2001) (contrasting loss causation – which "refers to a direct causal link between the misstatement and the claimant's economic loss" – with the "subjective" element of reliance) (internal quotations omitted).

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 20

Respectfully submitted,

/s/  David C. Frederick

| | |
|---|---|
| David C. Frederick | Erik Haas |
| Wan J. Kim | Peter W. Tomlinson |
| Gregory G. Rapawy | Philip R. Forlenza |
| Andrew C. Shen | Henry J. Ricardo |
| KELLOGG, HUBER, HANSEN, TODD, | PATTERSON BELKNAP WEBB & TYLER LLP |
|    EVANS & FIGEL, P.L.L.C. | 1133 Avenue of the Americas |
| Sumner Square | New York, NY 10036 |
| 1615 M Street, N.W., Suite 400 | Tel:  (212) 336-2000 |
| Washington, D.C. 20036 | Fax:  (212) 336-2222 |
| Tel:  (202) 326-7900 | ehaas@pbwt.com |
| Fax:  (202) 326-7999 | pwtomlinson@pbwt.com |
| dfrederick@khhte.com | prforlenza@pbwt.com |
| wkim@khhte.com | hjricardo@pbwt.com |
| grapawy@khhte.com | |
| ashen@khhte.com | |
| | David H. Wollmuth |
| George A. Zelcs | Frederick R. Kessler |
| KOREIN TILLERY LLC | Steven S. Fitzgerald |
| 205 North Michigan Avenue, Suite 1950 | Ryan A. Kane |
| Chicago, IL 60601 | WOLLMUTH MAHER & DEUTSCH LLP |
| Tel:  (312) 641-9750 | 500 Fifth Avenue, 12th Floor |
| Fax:  (312) 641-9751 | New York, NY 10110 |
| gzelcs@koreintillery.com | Tel:  (212) 382-3300 |
| | Fax:  (212) 382-0050 |
| Stephen M. Tillery | dwollmuth@wmd-law.com |
| Greg G. Gutzler | fkessler@wmd-law.com |
| Robert L. King | sfitzgerald@wmd-law.com |
| KOREIN TILLERY LLC | rkane@wmd-law.com |
| 505 North Seventh Street, Suite 3600 | |
| St. Louis, MO 63101 | |
| Tel:  (314) 241-4844 | |
| Fax:  (314) 241-3525 | |
| stillery@koreintillery.com | |
| ggutzler@koreintillery.com | |
| rking@koreintillery.com | |

*Attorneys for Plaintiff National Credit Union Administration Board*

Judges Cote, Lungstrum, O'Hara, and Wu
May 2, 2014
Page 21

cc:   Counsel of Record (via ECF)

Re:   *NCUA v. RBS & Wachovia*, Nos. 12-cv-2340 & 11-cv-2649
      *NCUA v. Credit Suisse Securities (USA) LLC*, No. 12-cv-2648
      *NCUA v. UBS Securities, LLC*, No. 12-cv-2591
      *NCUA v. Morgan Stanley & Co.*, No. 13-cv-2418

Re:   *NCUA v. Goldman, Sachs & Co.*, No. 11-cv-6521
      *NCUA v. RBS Securities, LLC*, No. 11-cv-5887