# EXHIBIT I

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209

(202) 326-7900

FACSIMILE:
(202) 326-7999

February 11, 2015

*Via Electronic Mail*

Jay Bhimani
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071

      Re:    NCUA Litigation: Defendants' First Set of Joint Interrogatories

Dear Jay:

      I write in response to your February 3, 2015 letter regarding our January 29, 2015 meet and confer concerning NCUA's responses to Defendants' First Set of Joint Interrogatories.

**1.      NCUA Interrogatory No. 1**

      The identity of the confidential witnesses cited in NCUA's complaints is irrelevant, privileged, and should not be disclosed. As we discussed, NCUA did not list these individuals in its initial disclosures as likely to have discoverable information, and NCUA does not intend to rely on these witnesses at trial. Accordingly, we do not understand how the disclosure of these individuals will lead to admissible evidence or aid Defendants' defenses of these actions, and we believe such disclosure is inappropriate. *See In re St. Paul Travelers Sec. Litig. II*, 2007 WL 1424673, at *1 (D. Minn. May 10, 2007) (disclosure of confidential witnesses mentioned in a complaint not required where plaintiff did not intend to rely on the witnesses at trial). Nonetheless, to avoid unnecessary motion practice, NCUA will amend its interrogatory responses to identify any confidential witness known to NCUA.

**2.      Credit Union Interrogatory No. 1 (WesCorp No. 9; U.S. Central No. 8; Southwest No. 1; Members United No. 1)**

      These interrogatories ask NCUA to:

> Identify all persons currently or formerly employed by [a credit union] . . . who received, read, reviewed, or consulted the Offering Documents . . . , and describe in detail which of these documents (and portion(s) thereof) each person read, reviewed, or consulted prior to the purchase of the . . . Certificates, and for each person identified describe whether that person recommended, did not recommend, or took no action with respect to the purchase of the . . . Certificates.

Defendants also requested that NCUA's response "include a separate response for each . . . Certificate, and should include the first date on which [a credit union] received the prospectus supplement concerning each . . . Certificate and from whom [the credit union] received the prospectus supplement and what other Offering Documents [the credit union] received."

NCUA objected to the relevance of these interrogatories because they purport to seek information regarding NCUA's reliance on certain offering documents, yet reliance is not an element of the claims at issue.[1] During our January 29 meet and confer, we asked you to provide any authority stating otherwise, and you have not done so.

Nor is the requested information relevant to materiality as Defendants claim. "Materiality . . . is judged by an objective and not a subjective standard"; the credit unions' subjective beliefs about which collateral characteristics were important are "irrelevant for the purposes of . . . materiality." *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 n.4 (S.D.N.Y. 1984) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)); *United States v. Natelli*, 527 F.2d 311, 319 (2d Cir. 1975); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 137 (S.D.N.Y. 2014) (in an RMBS class action, noting that "materiality of the misstatements [will not] require individual inquiries . . . [b]ecause materiality is determined by an objective rather than a subjective standard") (internal quotation marks omitted). Accordingly, NCUA will not supplement its responses.[2]

Despite its relevancy objections, NCUA has already identified for each certificate the individuals responsible for purchasing and credit analysis of the certificate. NCUA also identified pursuant to Federal Rule of Civil Procedure 33(d) the credit unions' "deal files" that contain the recommendation or approval of the purchases by the listed individuals (and others) as well as offering documents that the credit unions received and reviewed. Finally, NCUA answered that:

---

[1] *See FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *2 (S.D.N.Y. Dec. 18, 2012) (federal securities claims); *Cutler v. Rancher Energy Corp.*, 2014 WL 1153054, at *10 (C.D. Cal. Mar. 11, 2014) (California Blue Sky law) (citing *Bowden v. Robinson*, 136 Cal. Rptr. 871, 878 (Ct. App. 1977)); *NCUA v. RBS Sec., Inc.*, 900 F. Supp. 2d 1222, 1229 (D. Kan. 2012) (Kansas Blue Sky law is "essentially the same as" NCUA's federal securities claims, which do not require reliance); *Grenader v. McBee*, 23 F.3d 120, 123 (5th Cir. 1994) (Texas Blue Sky law); 815 ILCS 5/12 (Illinois Blue Sky law making it unlawful to sell securities "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"); *NCUA v. UBS Sec., LLC*, 2014 WL 2600133, at *4 (S.D.N.Y. June 10, 2014) ("The state law claims at issue here are, for all relevant purposes, strict liability claims.").

[2] Defendants also suggest that how the credit unions understood the offering documents might be relevant to whether the representations were misleading. Whether statements are misleading also is governed by an objective standard. *See SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1305 (2d Cir. 1971) ("The ultimate issue was whether the release was 'misleading to the reasonable investor.'").

Jay Bhimani
February 11, 2015
Page 3 of 6

> The [credit unions'] general practice was to review and rely upon Offering Documents . . . , including prospectuses, term sheets, free-writing prospectuses, prospectus supplements, and other information, that were available and/or provided to [the credit unions.] [The credit unions] used information disclosed in those Offering Documents, such as LTV, CLTV, owner occupancy, and DTI information regarding the mortgage loans to conduct credit analysis on the . . . Certificates. Moreover, if [the credit unions] had known that the mortgage loans underlying the . . . Certificates were originated in violation of underwriting guidelines, [the credit unions] would not have purchased the . . . Certificates.

These responses more than adequately answer the interrogatories. The burden of providing additional information beyond the information already provided is far outweighed by the fact that the interrogatories seek irrelevant information. Moreover, Defendants may depose former credit union employees if they desire additional information regarding their practices (to the extent that such practices are even relevant). *See* S.D.N.Y. Local Rule 33.3(b) (providing that most interrogatories "may only be served . . . if they are a more practical method of obtaining the information sought than a request for production or a deposition").

3.  **Credit Union Interrogatory No. 4 (WesCorp No. 12; U.S. Central No. 11; Southwest No. 4; Members United No. 4)**

   These interrogatories ask NCUA to:

   Identify all employees, committees, departments, and other persons (including but not limited to outside counsel . . . ) who were involved in: (i) the investigation, evaluation or assertion of any claims against the Defendants; (ii) the investigation, evaluation or assertion of any claims or allegations raised or described in the Complaints; or (iii) the investigation, evaluation or assertion of any claims with respect to any Certificate or Securitization, or any loan securing any Certificate or Securitization.

The interrogatories further state that "[w]ith respect to all third parties acting on [the credit unions'] behalf, . . . the response to this Interrogatory should set forth the date(s) they were retained or otherwise became involved in the subjects set forth in this interrogatory, beginning on the earliest of the date of retention or date(s) of other involvement."

   NCUA has provided this information with respect to the "investigation, evaluation or assertion" of claims asserted in the Complaints, subject to its objections to identifying any non-testifying consulting experts that NCUA may have retained and to identifying retained experts prior to the appropriate time under Rule 26(a)(2).

4. **Credit Union Interrogatory No. 6 (WesCorp No. 14(a)-(c); U.S. Central No. 14(a)-(c); Southwest No. 6(a)-(c); Members United No. 6(a)-(c))**[3]

>   These interrogatories ask NCUA to:

>   Identify for each ... Certificate the tranche from which that Certificate was purchased by [the credit union], the price paid, the date of [the credit union's] purchase, and the entity from which the purchase was made, including whether such Certificate was purchased from the initial offering or the secondary market, the amount of any subsequent repayments of principal, missed or late payments, if any, the unpaid principal balance on each Certificate, the cumulative income received on each such Certificate, whether that Certificate was sold, the price of sale, the date of sale, the entity from which the sale was made, whether such sale was made through the National Credit Union Administration Board Guaranteed Notes Program, and whether any interest in the Certificate was retained or repurchased by [the credit union] (and if so, describe the interest retained or repurchased).

NCUA provided detailed information regarding the purchase and performance of each certificate (*e.g.*, the price paid and repayments of principal and interest). Defendants have not suggested that NCUA's responses are deficient as to these distinct requests. With respect to the disposition of the certificates, NCUA responded:

>   In 2010 and 2011, most of the ... Certificates were conveyed to a series of [NCUA Guaranteed Notes ("NGN")] Trusts, in a series of transactions known as the NGN Program. These conveyances occurred pursuant to various Trust Agreements by and among the National Credit Union Administration Board in its Capacity as Liquidating Agent of [the credit union] and other corporate credit unions, Wells Fargo Delaware Trust Company, N.A., and the Bank of New York Mellon. Pursuant to Rule 33(d), NCUA specifies the NGN offering and closing documents at NCUA_A_0011194 – NCUA_A_0011203. The terms of the conveyances are set forth in such documents.

NCUA further identified each certificate that had not been conveyed via the NGN Program.

>   Your January 23 letter incorrectly states that NCUA had not provided certain information regarding the conveyance of the certificates.[4] As we explained on the January 29 meet and

---

[3] Credit Union Interrogatory No. 6 comprises three separate interrogatories issued to each credit union seeking information regarding (i) the purchase of the securities, (ii) the performance of the securities after purchase, and (iii) the disposition of the securities after purchase.

[4] Specifically, the letter contended that NCUA had not provided: "(1) which certificates were conveyed to trusts as part of the NGN Program; (2) the price, if any, at which the certificates were sold in connection with the NGN transactions (or otherwise, if the sale was not part of the NGN Program); (3) the entity from which they were sold; *(4) particularly if the disposition was not a sale, a description of the transaction, as well as whether there was any*

Jay Bhimani
February 11, 2015
Page 5 of 6

confer, all of the information requested by the interrogatories is provided in the NGN offering and closing documents cited in NCUA's responses. For example for NGN 2010-R1 – one of the NGN trusts at issue – the offering and closing documents contain a Final Offering Memorandum, a Note Purchase Agreement, a Trust Agreement, and a Cross Receipt that list the requested information.

During the January 29 meet and confer and in RBS's February 3 letter, Defendants indicated they were not satisfied with NCUA's response because the NGN offering and closing documents reference an aggregate amount for which the certificates were disposed of in the NGN transactions, but they do not allocate dollar amounts to individual certificates. That aggregate amount, however, represents the precise terms of the NGN transactions, and that is the only figure NCUA is required to identify in its interrogatory response. Nonetheless, to avoid unnecessary dispute, NCUA will amend its interrogatory response to include additional information regarding the aggregate "net proceeds" of the relevant NGN transactions. NCUA's continuing investigation also has revealed that one of the certificates that was not re-securitized in the NGN was subsequently sold by NCUA as liquidating agent for Members United, and NCUA will amend its interrogatory response accordingly.

**4.    Southwest Interrogatory No. 9 & Members United Interrogatory No. 9**

These interrogatories ask that NCUA state for each Southwest and Members United Certificate "when and how [they] first became aware of any alleged misrepresentations or omissions." As NCUA explained in its objections, these interrogatories seek irrelevant information to the extent they seek information with respect to Defendants' statute of limitations defense. The statute of limitations is measured by when "a reasonably diligent plaintiff would have sufficient information about [the claim] to adequately plead it in a complaint." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). That is an objective inquiry for which the credit unions' subjective awareness is irrelevant. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).

At best, the interrogatories seek information with respect to Defendants' affirmative defenses of actual knowledge. On that score, NCUA responded that Southwest and Members United "did not have access to loan files for the loans prior to discovery in this litigation, and therefore had no means of definitively discovering the true quality of the underlying loan pool with specificity." Accordingly, as we have explained, Southwest and Members United – which no longer exist – could not have actual knowledge of the alleged misrepresentations and

---

*payment or other consideration provided in connection with the transaction;* and (5) the eventual disposition of all of the certificates, *including privately-issued certificates, issued as part of the NGN Program*, including the sale price and whether NCUA purchased or retained any such certificates." The italicized information was not encompassed within the interrogatory served on NCUA. In particular, the interrogatory sought information regarding the disposition of the "Certificates" (defined as the RMBS Certificates on which NCUA has sued). Defendants did not seek information regarding the disposition of the certificates issued as part of the NGN Program, which is irrelevant in any case. Accordingly, NCUA has not responded with respect to these new requests for information.

omissions at issue (*i.e.*, that the loans did not comply with applicable underwriting guidelines and their collateral characteristics were misstated). Any actual knowledge of these misstatements and omissions can result only from inspections of the loan files themselves, which is an ongoing aspect of this litigation.

  Defendants have contended that NCUA's response does not answer these interrogatories. But when NCUA asked Defendants to clarify what other information the interrogatories request, Defendants completely failed to do so. In particular, NCUA asked Defendants during the meet and confer to specify how they were using the term "aware" in this interrogatory such that NCUA could evaluate whether the current response was insufficient. Defendants simply stated that "aware" means "aware." The definition of "aware[ness]" is "having knowledge," and NCUA answered the interrogatory fully using that dictionary understanding of the term "aware." Critically, Defendants have not explained what is supposedly lacking: in its February 3 letter, just as during the meet and confer discussion, RBS repeats "that this interrogatory does not seek information about actual knowledge (as interpreted by NCUA); instead, it asks when these credit unions first became aware of the misrepresentations or omissions alleged in the complaints" – which is precisely the question that NCUA answered. In sum, despite requests by NCUA, Defendants have offered no basis to conclude that NCUA has not properly interpreted – and answered – the precise interrogatory that Defendants have served.

  We are available to meet and confer on these issues.

            Best regards,

            /s/ Andrew C. Shen
            Andrew C. Shen